<pre>
 1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3   THOMAS WHITAKER, et al     .  C.A. NO. H-13-2901
                               .  HOUSTON, TEXAS
 4   VS.                        .
                               .  AUGUST 18, 2015
 5   BRAD LIVINGSTON, et al     .  2:00 P.M. to 3:58 P.M.

 6

 7                   TRANSCRIPT of HEARING
              BEFORE THE HONORABLE LYNN N. HUGHES
 8                UNITED STATES DISTRICT JUDGE

 9

10   APPEARANCES:

11   FOR THE PLAINTIFFS:          MS. BOBBIE L. STRATTON
                                  Baker, Donelson, Bearman,
12                                   Caldwell & Berkowitz
                                  1301 McKinney
13                                Suite 3700
                                  Houston, Texas 77010
14

15   FOR THE DEFENDANTS:          MS. FREDERICKA SARGENT
                                  Office of the Attorney
16                                   General
                                  300 W 15th Street
17                                8th Floor
                                  Austin, Texas  78701
18
                                  MS. SHARON FELFE HOWELL
19                                General Counsel
                                  Texas Department of Criminal
20                                   Justice
                                  P.O. Box 4004
21                                Huntsville, Texas  77342-4004

22

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
</pre>

APPEARANCES CONTINUED

OFFICIAL COURT REPORTER:                    MS. KATHY L. METZGER
                                            U.S. Courthouse
                                            515 Rusk
                                            Room 8004
                                            Houston, Texas   77002
                                            713-250-5208

P R O C E E D I N G S

*THE COURT:*  Thank you.  Please be seated.

I let some mock trial students use the courtroom, and they adjusted my chair for short people.  I'm not.  And every time I sit down in it, I think about it, but then I burst from the room to go do something else and I don't think about it until I sit down in it again.

All right.  Ms. Stratton --

*MS. STRATTON:*  Yes, Your Honor.

*THE COURT:*  -- where is Levin?

*MS. STRATTON:*  She is in Philadelphia.

*THE COURT:*  Why does she need to be listed as counsel?

*MS. STRATTON:*  She was originally part of our case -- I mean, she still is counsel for these clients.  She moved --

*THE COURT:*  Has she ever met with these clients?

*MS. STRATTON:*  I believe she has, yes, Your Honor.

*THE COURT:*  Have you met with them?

*MS. STRATTON:*  I have not personally met them, no.

*THE COURT:*  Who on the team of these gentlemen has met with them?

*MS. STRATTON:*  Ms. Levin.

*THE COURT:*  But you're not sure about that?

*MS. STRATTON:*  Not a hundred percent absolutely sure. We were originally retained through their habeas attorneys, who got authority from them to become our clients.

1      *THE COURT:* And who was the habeas attorney?

2      *MS. STRATTON:* All three of the original plaintiffs

3 have different lawyers. I don't know what they are -- I don't

4 know their names off the top of my head. I do have them in my

5 records.

6      *THE COURT:* You don't know, do you?

7          By "original" you mean with the Court of Criminal

8 Appeals or here?

9      *MS. STRATTON:* Oh, when we originally -- when they

10 originally retained us for this representation, it was through

11 their habeas attorneys, so their federal court lawyers.

12      *THE COURT:* Is Levin a member of the bar of this

13 Court?

14      *MS. STRATTON:* Yes, Your Honor, she is. She moved to

15 Philadelphia, I'm not sure exactly the date, but it was during

16 the pendency of this case.

17      *THE COURT:* Well, by a rough look, it's been 18 months

18 since she's done anything in this case.

19      *MS. STRATTON:* Since she's done anything?

20      *THE COURT:* Yes.

21      *MS. STRATTON:* Maybe since she signed a pleading,

22 that's possible.

23      *THE COURT:* No, she signed every pleading, because

24 we've got all 14 people on the pleadings, but I'm just not sure

25 she represents Walker and Williams.

```
 1          MS. STRATTON:  She does, Your Honor.  I had a --
 2          THE COURT:  How do we know that?
 3          MS. STRATTON:  -- conference call with her this
 4    morning about this hearing.  So, yes, I know that she does.
 5          THE COURT:  Do they know that?
 6          MS. STRATTON:  Do they know that?
 7          THE COURT:  Yes, ma'am.  These two fellows are not an
 8    issue.  They're not a statement.  They're temporarily at least
 9    live human beings --
10          MS. STRATTON:  Correct.
11          THE COURT:  -- that need to be at least comfortably
12    aware of what's being done in their name and by whom.
13          MS. STRATTON:  I don't disagree with that, Your Honor.
14          THE COURT:  Well --
15          MS. STRATTON:  Those are -- that's what's required of
16    us in our rules of ethics.
17          THE COURT:  But to your knowledge, nobody on the
18    plaintiffs' team has met in person with Walker or Williams?
19          MS. STRATTON:  I have not.  No one at Baker Donelson
20    has.  I will not submit to you that that's the case.  That's
21    certainly not the case.  I believe that Ms. Levin has.  And
22    we've been in touch with them through their habeas counsel.  I
23    mean, to be frank, Your Honor, we're not -- we can't pick up
24    the phone and call them.  I mean, they can't receive our phone
25    calls.  And, you know, we have not gone out of our way to go to
```

their prison and visit with them about this case, no.

        *THE COURT:*  Where are they?  The Walls?

        *MS. STRATTON:*  Pardon?

        *THE COURT:*  Which unit are they in?

        *MS. STRATTON:*  They're in the Huntsville Unit.

        *MS. HOWELL:*  They're in the Polunsky Unit.

        *MS. SARGENT:*  Polunsky Unit.

        *MS. STRATTON:*  Oh, okay.  I apologize.

        *THE COURT:*  And where is it?

        *MS. HOWELL:*  In Livingston, Texas.

        *MS. STRATTON:*  I apologize, Your Honor.

        *THE COURT:*  No, that's all right.  I used to know all of them, but they keep building them.

        Do you know where Livingston is?

        *MS. STRATTON:*  Well --

        *THE COURT:*  It's next to Lake Livingston.

        *MS. STRATTON:*  -- it's north of here.  I will not pretend to be from Texas.  So, I'm not.  I'm from Arizona.  I moved here 15 years ago.  I most certainly do not know where all of the cities in this state are.

        *THE COURT:*  Ms. Stratton, Sam Houston, Stephen Austin, Milam, Travis, Bowie, none of them was from Texas.

        *MS. STRATTON:*  Then I'm in good company.

        *THE COURT:*  That's right.  We're all immigrants.  My mother was from Memphis.  My dad was from Spokane.  I happen to

1  be born here because I needed to be near her at the time.

2  Nobody asked me where she ought to be.

3      MS. STRATTON:  My children are in the same boat, Your

4  Honor.

5      THE COURT:  Now you're the one here.

6      MS. STRATTON:  Yes.

7      THE COURT:  So I have to talk to you.

8      MS. STRATTON:  That is perfectly fine.

9      THE COURT:  There are some things that you can do to

10  help Mr. Whitaker and Mr. Chambers.  One is we're now -- when

11  did this thing start?

12      MS. STRATTON:  September 2013.

13      THE COURT:  So fixing to be two years.  And the

14  caption could be abbreviated to Thomas Whitaker and Perry

15  Williams versus Brad Livingston, et al.  Couldn't it?  And that

16  would save --

17      MS. STRATTON:  Oh, you mean when we draft our

18  pleadings?  I'm sure.  If the Court prefers that, I'm happy to

19  do that.

20      THE COURT:  No, it's what's done traditionally, which

21  is not always a good idea, but that's a sixth of a page that's

22  just done with an all capital, bold list of a bunch of people,

23  including the unknown people.  You understand that this does

24  not address any executioner.  If you find an executioner, you

25  must amend your petition with who they are and what they have

1   done.  You can't sue unknown people.  That's not how it's done.
2   They're unknown, but you can't make them a party.
3            You're probably thinking about Bivens versus five
4   or seven unknown DEA agents.  The reason for that was that the
5   United States, with its usual concern for justice, refused to
6   tell Mr. and Ms. Bivens and their children who conducted the
7   raid.  But there was actually a historical fact.  It was only
8   government malicious obfuscation that kept it from being known.
9            These unknown people have done nothing to
10  anybody.  There's no historical fact to be revealed by the
11  State of the Texas, or it would have revealed them.  And I
12  think we could generally refer to the defendants as Texas
13  rather than the acronym TIJC, or whatever it is, just as a
14  shorthand.  It makes reading -- now, in argument and
15  authorities on the bottom of page 1 of the plaintiffs' motion
16  for discovery, in that paragraph, ma'am, there are five dates
17  in 3 inches, 3 vertical inches, not horizontal inches, and one,
18  two, three -- and three references.  It's unreadable.  And
19  apparently it's unread, ma'am, because the top of page 2, we
20  have a singular respondent's advisory, and then we have a
21  plural defendants in the next line.  Do you see that?
22       MS. STRATTON:  I do see that, Your Honor.  I
23  personally --
24       THE COURT:  Now, I don't mind if you download the
25  whole thing, but at least it ought to be consistent about who's

1 doing what to whom.

2       *MS. STRATTON:* I agree with you, Your Honor. The

3 defendant --

4       *THE COURT:* Now, don't close the page there.

5       *MS. STRATTON:* Oh.

6       *THE COURT:* Because at the bottom of Paragraph 2,

7 there's one, two, three -- five acronyms in five lines and

8 three or four quotations and two footnotes.

9         Now, I have a docket sheet, so I know when things

10 are filed, and frequently the date things are filed are not

11 important. Is it?

12       *MS. STRATTON:* Not necessarily. But I know that

13 sometimes, because I typically use dates and docket references

14 in my federal court pleadings to help everyone involved in the

15 case understand if they need to go to the docket quickly

16 and they could --

17       *THE COURT:* I understand that, but you then quote

18 my -- you quote their response about what they said about my

19 order.

20       *MS. STRATTON:* Yes.

21       *THE COURT:* I actually used your motion for discovery,

22 I guess it is, yes, as a bad example at a lecture Saturday. I

23 didn't tell them who had done it, because I don't know that you

24 did it. You're just right now personally responsible for it.

25       *MS. STRATTON:* Well, Your Honor, I think I signed it,

so I'm responsible for it.

     *THE COURT:*  Everybody signed it though.  That's the problem.  You're the top one, but like with the Attorney General's Office, that doesn't mean the top name is the responsible name.

     *MS. STRATTON:*  Well, I am the responsible --

     *THE COURT:*  But I pointed out that we're discussing discovery, and it is at the bottom of page 5 when we get Footnote 8 that mentions the poor man's date of execution.  And I'm not telling you how to practice, but even though we've been told by the great State of Texas, you tell me not to believe them all the time, but I would start out and say, Thomas Whitaker and Perry Williams, especially Mr. Williams because his execution date has been set for two months from now, need discovery.

     And there's an interesting term on page 6 in Paragraph 15c.  You want documents about the prison's outreach.  What exactly is pharmacological outreach?

     *MS. STRATTON:*  Your Honor, I don't think we mean pharmacological outreach.  I think what we --

     *THE COURT:*  That's what you're telling them.  You want the details about its study of the pharmacology of pentobarbital after its best used by date.

     *MS. STRATTON:*  Yes.  That is a good summary of what 15c is asking for.

1    THE COURT:  And has a firing squad been held to be

2  constitutional?

3    MS. STRATTON:  There is a case that has held a firing

4  squad is constitutional.

5    THE COURT:  And how about the electric chair?

6    MS. STRATTON:  Probably.  I don't know for sure, but

7  probably, most likely.

8    THE COURT:  Hanging?

9    MS. STRATTON:  I do not know.

10    THE COURT:  Gas chamber?

11    MS. STRATTON:  Probably.

12    THE COURT:  In none of the response to my order did

13  anybody suggest to me an answer that would fit into a

14  prescription for a drug.  None of them said, Well, the

15  pentobarbital is fine except you need to do this with it.  And

16  I got from, I guess, both sides a lot of quotations about the

17  recent case.  *Gross*, is it?

18    MS. STRATTON:  *Glossip*, Your Honor.

19    MS. SARGENT:  *Glossip*.

20    MS. STRATTON:  *Glossip v. Gross*, yes.

21    THE COURT:  Yes.  And, no, it didn't hold that this

22  particular form of execution in Texas for these two men is

23  constitutional.

24    MS. STRATTON:  Correct.

25    THE COURT:  Well, who thought they did?

1          MS. STRATTON:  Pardon?

2          THE COURT:  Who thought that it held anything except

3   for Mr. Gross?  The Supreme Court decides cases.  It decided

4   the case of whatever that other drug was, and it suggested

5   that -- or it held that there was an available equally good

6   drug, and they said nice things about pentobarbital.  Didn't

7   they?

8          MS. STRATTON:  Yes, that's what the Court held.

9          THE COURT:  But the Court didn't hold anything about

10  Whitaker, Williams, or Texas in that case.

11         MS. STRATTON:  It did not, Your Honor.

12         THE COURT:  It did hold that a different cocktail,

13  which is similar in operation and effect apparently to

14  pentobarbital, was constitutional.

15         MS. STRATTON:  It held midazolam was constitutional,

16  yes.

17         THE COURT:  And are you telling me that the Supreme

18  Court in that case held that all of these things you've talked

19  about are required, on page 5, Paragraph 11 of the response to

20  my August 10 inquiry?

21         MS. STRATTON:  I'm sorry, Your Honor.  I didn't follow

22  your whole question.

23         THE COURT:  All right.  Paragraph 11, do you have it?

24         MS. STRATTON:  Of my motion for discovery or my

25  response?

1    *THE COURT:*  No, of the submission in response to the

2  August 10th thing.

3        *MS. STRATTON:*  It's in front of me.

4        *THE COURT:*  Okay.  Is it the petitioner's position

5  that that court held in Oklahoma each of these six bullets are

6  constitutionally required?

7        *MS. STRATTON:*  That is not what the court in *Glossip*

8  said.  The court in *Glossip* evaluated the district court's

9  ruling for clear error.  The district court conducted an

10  evidentiary hearing regarding the -- whether or not the

11  Oklahoma protocol was constitutional.  And there was evidence

12  before the Court that evaluated the constitutionality of that,

13  including the availability of known alternative drugs and the

14  U.S. Supreme Court --

15        *THE COURT:*  None of that --

16        *MS. STRATTON:*  -- entered that ruling by not finding

17  that the court committed clear error.

18        *THE COURT:*  They upheld it, ma'am.  You can equivocate

19  all you want.

20        *MS. STRATTON:*  I'm sorry, Your Honor.  I wasn't trying

21  to equivocate.  I was trying to --

22        *THE COURT:*  But they took 75 pages and lots of dictum.

23        *MS. STRATTON:*  Yes.

24        *THE COURT:*  But the holding is that constitutionally

25  what Oklahoma intended to do was constitutional.

1          *MS. STRATTON:*  Yes.

2          *THE COURT:*  And so the standard announced -- or

3     reannounced in that case is the same one that's been around for

4     a while.

5          *MS. STRATTON:*  It reaffirmed what was held in *Baze*,

6     yes.

7          *THE COURT:*  And that's been the standard.  So there's

8     nothing new in that case except the reaffirmation of the rule

9     that they've been applying and the holding that, as done in

10     that instance in Oklahoma, it was constitutional.

11          *MS. STRATTON:*  *Baze* was a case decided in 2008.

12     There's been a lot of litigation since 2008, including a couple

13     of court cases before the U.S. Supreme Court.  And the

14     petitioners in *Glossip* were trying to distinguish those other

15     cases from *Baze*, and they did not win.

16          *THE COURT:*  Ma'am, as long as there's a death penalty,

17     there's going to be litigation.

18          *MS. STRATTON:*  That is probably true, Your Honor.

19          *THE COURT:*  This is not about the United States

20     Constitution.  It's about opposition as a political -- and I

21     don't say that derogatorily, but as a political matter to the

22     policy choice of having it.

23          *MS. STRATTON:*  For some people, that is true.  Not for

24     me, but for some people.

25          *THE COURT:*  Well, if Texas returned to hanging, there

1  would be a lawsuit on every capital case.

2          MS. STRATTON:  If Texas did what, I'm sorry?

3          THE COURT:  Returned to hanging people.

4          MS. STRATTON:  Oh, returned to hanging.  Probably.

5          THE COURT:  Have you looked at the cases related to

6  the recent firing squad use?

7          MS. SARGENT:  I have not, Your Honor, but the Supreme

8  Court discussed in *Glossip* that they have never held a method

9  of execution to be specifically unconstitutional.  That would

10 include the firing squad, that would include hanging, the gas

11 chamber, and, of course, lethal injection.

12         THE COURT:  Did you say electric chair?

13         MS. SARGENT:  And the electric chair, yes.  They've

14 all been upheld repeatedly.

15         THE COURT:  So what I was hoping for was that the

16 petitioners would say this drug done this way is acceptable.

17 And I understand that counsel probably don't think that's a

18 very good idea because then Texas might just choose the one

19 they picked and they'll have no argument.  But as the Court in

20 Washington has said repeatedly, the penalty is constitutional.

21         The first Congress, the people who wrote the

22 Congress, about half of them had been drafters or members of

23 the convention, voted to make counterfeiting a capital offense,

24 in the first Congress, as I recall, and I'm doing this by

25 memory.  That's some clear -- if you're an original intent kind

1   of guy, then that might be clear of what they were thinking at
2   the time.  But as somebody said, they're evolving social norms.
3   The problem is neither I nor the Supreme Court nor the
4   Constitution reflect evolving social norms.  There are all
5   kinds of things that have been abandoned by the states and by
6   the United States that never were the slightest bit
7   unconstitutional.  They just were bad policies.
8              This is a bad policy, by political judgment,
9   which has no weight whatsoever anywhere, not even at home.  It
10  is the law, and it's constitutional.  And the only question
11  here can be, is its application cruel and unusual.
12          *MS. STRATTON:*  Yes, Your Honor.
13          *THE COURT:*  That's it.  And I need Whitaker and
14  Williams to give me something concrete.  I've got every phrase,
15  but I don't have anything in particular.  Remember, for
16  Mr. Yowell and for these folks to start with, the complaint was
17  that using a compounding pharmacy was in itself a violation of
18  the Constitution because of the monumental risk of danger.  Do
19  you remember that?
20          *MS. STRATTON:*  I do, Your Honor.
21          *THE COURT:*  Were you here?
22          *MS. STRATTON:*  I sat right here in this very chair.  I
23  was about this pregnant when I said it, and I said it, yes.
24          *THE COURT:*  How many did you have that time?
25          *MS. STRATTON:*  Fortunately just one.  But it made my

1  total three, so...

2        THE COURT:  So when I'm asked the question how many

3  children I have, I say "three too many."

4        MS. STRATTON:  I'll keep that in mind.

5        THE COURT:  So you may feel that way.

6        MS. STRATTON:  I did yesterday.

7        THE COURT:  And you'll recall then that the evidence

8  submitted by all three was something about old people getting

9  meningitis after a month in Massachusetts.

10        MS. STRATTON:  We had a very undeveloped record, Your

11  Honor.

12        THE COURT:  No, ma'am.  That's not about my record.

13        MS. STRATTON:  We.  We, the collective plaintiff we.

14        THE COURT:  But you offered some -- and I use this

15  word advisedly -- clown, talk about a rest home in

16  Massachusetts and meningitis.  It took them more -- well, what

17  is -- it may have said on your chart -- the average length of

18  time from injection to expiration?

19        MS. STRATTON:  I believe she said minutes, Your Honor.

20  I don't know that she gave a specific time but --

21        THE COURT:  I'm not sure it's on the chart.  But

22  somebody told me once before and I've forgotten it, so I

23  just --

24        MS. HOWELL:  I don't think it's on the chart.

25        MS. SARGENT:  Are you talking about the length of time

1  from the injection to the --

2          *THE COURT:*  Expiration.

3          *MS. SARGENT:*  -- to the time of death?

4          *THE COURT:*  Yes.

5          *MS. SARGENT:*  On average, we're looking anywhere from

6  10 to 20 minutes, maybe 25 minutes.

7          *THE COURT:*  Okay.  So nobody is going to catch

8  meningitis in 20 minutes.

9          *MS. STRATTON:*  Correct, Your Honor.

10          *THE COURT:*  So I've been offered no data which would

11  tell me that pentobarbital that is six months beyond its best

12  use by date has these characteristics and this is the problem

13  it would cause.  I just have assertions that it must be

14  absolutely pure.  And that's not the test.  The test is its

15  operating effectiveness.  And effective includes not causing --

16  as I recall, there was also an assertion originally in this

17  case that it could cause convolutions.  That's an

18  anticonvulsant.  So I don't know how that causes convolutions.

19  I guess too much of anything is bad.

20          *MS. STRATTON:*  Your Honor, at the time of that

21  original hearing regarding Michael Yowell, it was within days

22  of the filing of the case.  We utilized an affidavit --

23          *THE COURT:*  That's neither the State of Texas nor the

24  Court's fault.

25          *MS. STRATTON:*  No, not at all.  I'm just trying to

1  explain, Your Honor.  He's not our retained expert.  He's not

2  the person that we retained to --

3      THE COURT:  No, because I said he couldn't be an

4  expert, because he's not one.

5      MS. STRATTON:  Well, we took what you said to heart.

6  We didn't even approach him.  And we retained someone that we

7  felt had an appropriate background in order to respond to the

8  Court's April order about the compounding process.

9      THE COURT:  And he did.  And I believe they both came

10  to the same -- Fout, is that your guy?

11      MS. HOWELL:  Yes.

12      THE COURT:  Ruble and Fout came to the same

13  conclusion, that if the pentobarbital tests correctly after

14  it's made and when it's at the prison, if it passes the quality

15  tests for purity, for antisepticness -- is that what you call

16  it?

17      MS. SARGENT:  Sterility --

18      THE COURT:  The sterility.

19      MS. STRATTON:  Impotency.

20      THE COURT:  Pardon?

21      MS. STRATTON:  It's the impotency.

22      THE COURT:  If it passes the tests, what happened in

23  Minnesota last April when they were making something doesn't

24  matter.

25      MS. STRATTON:  Except it sits in a refrigerator --

1      *THE COURT:*  No, no.  Assume that the day of the

2  execution, they test it.

3           *MS. STRATTON:*  Oh, the day.  Okay.

4           *THE COURT:*  Let's start there.  Then no complaint.

5           *MS. STRATTON:*  We would be hard pressed to find a

6  complaint.

7           *THE COURT:*  And so then my question is, you can move

8  back from the execution to the test, to do it 14 days at a time

9  or something.  I don't have any scientific data on which --

10  that both reports were very densely typed and since they

11  were -- I believe they had more citations than you-all did.  So

12  that is both of you.

13          *MS. STRATTON:*  I'm sure that ours did.

14          *THE COURT:*  I think you probably won, but it was

15  close.

16          *MS. STRATTON:*  But I -- and you should have seen the

17  original draft, Your Honor.  It was much more dense than that.

18          *THE COURT:*  But it talks about things that can go

19  wrong.

20          *MS. STRATTON:*  Yes.

21          *THE COURT:*  But there's no talk about if it's

22  refrigerated for six months, what is the probability of each of

23  those things going wrong.  I mean, that's like saying -- by the

24  way, I dissent from -- only mildly from Whitaker and Williams

25  saying this, but the Supreme Court didn't really mean it when

1  they said I didn't know enough science to evaluate this stuff.

2  That hurt my feelings.  Now, if they're talking about Judge

3  Hittner, that would be different.  And he's a friend of mine.

4  I just use him to better my jokes, because he's available.

5              I need something from Ruble that addresses the --

6  my problem is if the sterility has dropped to a dangerously low

7  level, is it dangerous for pain?  I think if you're injected

8  with dirty pentobarbital, the effect would be the same.  And

9  I'm not suggesting that you should do that.

10             And, Ms. Sargent, what -- if the doctors say that

11  an ounce is a fatal dose, how many ounces do you give them?

12       MS. SARGENT:  I'm not sure what the conversion is, but

13  we give 5 grams.  Five grams.

14       THE COURT:  Five grams?

15       MS. SARGENT:  Five grams of pentobarbital.  That's per

16  our protocol.

17       THE COURT:  All right.  Now, how many grams would be

18  fatal?

19       MS. SARGENT:  Two is normally fatal, but so 5 is

20  overwhelmingly fatal.

21       THE COURT:  No, I assumed that there was a --

22       MS. SARGENT:  Yeah.

23       THE COURT:  -- I hate to call it this, but a margin of

24  safety -- a margin of death.

25       MS. SARGENT:  Yes.

1    THE COURT:  And so if it were impotent by 50 percent,

2  it still has a 25 percent margin of death?

3    MS. STRATTON:  I don't know if that's a realistic

4  calculation.  I would have to ask Mr. Ruble.

5    THE COURT:  Well, I'm assuming that.  I mean, it has

6  to be, right?  If it's half the --

7    MS. STRATTON:  I would presume based on math, you

8  could do that kind of calculation, but, you know, I don't know.

9    THE COURT:  All right.  But if it is half as potent as

10  they intended, it's still more than potent enough to kill you.

11  So assuming that's true, there's still no pain involved.

12  Right?

13    MS. STRATTON:  That would be for Dr. Ruble to tell me.

14    THE COURT:  Logic --

15    MS. STRATTON:  I don't --

16    THE COURT:  See, the reason we have nonexpert judges

17  is because common sense is really important.  And it simply

18  cannot be -- in some, the potency, you know, a little water or

19  something or deterioration -- and it could be that some drugs

20  deteriorate so that they're impotent rather quickly.  But Ruble

21  didn't tell us about any -- I don't know what the -- we never

22  looked it up, transmutation that occurs.  Some things just --

23  you know, like radioactive things, they decay and they

24  substantively change spontaneously as opposed to just weaken in

25  the state that they just start in.  Those are two kinds of

1  potency problems.  Nobody tells me which one are we talking
2  about.
3             And the same way with sterility.  The problem
4  with sterility is, you get secondary infections.  It seems to
5  me that that's irrelevant for somebody with a life expectancy
6  of 20 minutes.  And I didn't list all of the other things.
7        MS. STRATTON:  Your Honor, I am sure -- most likely
8  sure, that that is something that Dr. Ruble could opine about.
9        THE COURT:  Can he do it briefly?
10       MS. STRATTON:  I've heard you loud and clear, Your
11 Honor, and asking Dr. Ruble to be more brief will be one of my
12 next conversations with him.
13       THE COURT:  And have him send you --
14       MS. STRATTON:  But when he submitted his affidavit --
15 I'm sorry.
16       THE COURT:  Have him send you his report in an
17 editable file, so you can raise the font size to 6 or
18 something.  I mean, don't laugh.  Your guy is just about as
19 bad.  So, you know, I am willing to read the record.  It's just
20 my eyes shouldn't bleed.
21       MS. STRATTON:  Fair enough, Your Honor.  We tried to
22 keep what Dr. Ruble provided in that report to be a very
23 concise response.  I say "concise" with air quotes, but a very
24 specific response to the Court's question about the compounding
25 process.  He could have said a lot more about compounded drugs

1    in general, but we tried to keep him very focused on what
2    you're asking.

3           *THE COURT:*  All right.  But he didn't say there's
4    anything wrong with compounded drugs.

5           *MS. STRATTON:*  Pardon?

6           *THE COURT:*  He didn't say there's anything wrong with
7    compounded drugs.  He said you can have the problems in the
8    compounding, the same problems you have in manufacturing them.
9    And if he thinks that it's persuasive and say the FDA is more
10   intrusive than a manufacturing and a compounding place, he
11   hasn't had much experience with the FDA.

12          *MS. STRATTON:*  I don't know if he said that, Your
13   Honor.

14          *THE COURT:*  But there were lots of citations to FDA
15   rules that apply to manufacturers that don't apply.  But both
16   of them have agreed, after whatever they do, if it tests pure,
17   it's okay.  So the request for every vendor they've ever looked
18   at or talked to is malicious.  Because what happened when I
19   gave you with Yowell the name of the laboratory, he gets death
20   threats from these sensitive, warm feeling people.

21               And the reason Oklahoma is using that drug is
22   because they were using pentobarbital and the harassment of
23   those suppliers caused them to quit being willing to supply.  I
24   suspect the reason for the name on the purchase order is the
25   Huntsville Unit Hospital is to stop snoops from attacking

1  whoever sells it to them.  They had the license.  I don't care
2  when it went out.  It's no different than saying, Well, they
3  ordered it in the name of Baylor Katy and the license is in
4  Baylor.  It's all the same thing.  But that's just -- it has
5  nothing to do with the actual purity of the drugs, which are
6  verified by an independent laboratory.
7         MS. STRATTON:  On a date certain.
8         THE COURT:  Pardon?
9         MS. STRATTON:  On a date certain.  And then they're
10 used for months after that time period.
11        THE COURT:  All right.  Ms. Howell, don't look scared.
12        MS. HOWELL:  I'm not scared.
13        THE COURT:  Oh, yes, you are.  You should be.
14               Do you know when the last time Texas proposes to
15 test Mr. Williams's dose?
16        MS. HOWELL:  Mr. Williams's dose was tested, I
17 believe, in April, Your Honor.
18        THE COURT:  Okay.  Does it propose not to test it
19 between now and September 29th?
20        MS. HOWELL:  That is our proposition, to not test it
21 between now and September 29th.
22        THE COURT:  Why don't you test it again?
23        MS. HOWELL:  It consumes the sample to do so.  It
24 consumes enough of the sample to make a difference in the
25 application of the dose.

1    *THE COURT:*  All right.  That's why it's important to
2  know that despite the best used by data, or whatever that is
3  and all that, I need to know what happens in the first, second,
4  third, fourth, fifth, sixth, seventh, eighth month after the
5  tests, precisely.
6         *MS. STRATTON:*  Okay.
7         *THE COURT:*  And Ruble is bound to know that or have
8  access to that information.
9         *MS. STRATTON:*  If it exists, he would know.
10        *THE COURT:*  And, again, this is not a therapeutic
11 dose.  So you don't want people using pills and thinking
12 they're getting a hundred milligrams of help when they're only
13 getting 75.
14        *MS. STRATTON:*  The only caveat from my previous
15 conversations with him was that the testing is not done for
16 purposes of lethal injection.  The testing on the drugs is not
17 done for that purpose, and so there's a fair amount of
18 speculation as to what would happen.
19        *THE COURT:*  Well, wait.  You mean they test less for
20 therapeutic use than they do for fatal use?
21        *MS. STRATTON:*  Well, my point is they don't test for
22 fatal use, and so you're applying --
23        *THE COURT:*  Well, but fatal use --
24        *MS. STRATTON:*  -- that's for therapeutic use to
25 another process, and I don't know if he'll opine that that

makes a difference or not.  I just know it's a conversation
I've had with him.

    *THE COURT:*  All right.  All of the studies that have
been done on therapeutic use will have information about what
too much is.

    *MS. STRATTON:*  I believe that's true, Your Honor.

    *THE COURT:*  And I doubt that any of them will have,
well, if you leave it around, it takes twice as much to be too
much.  But somehow Texas thinks that 1 gram is a fatal dose.
Isn't that what you told me?

    *MS. SARGENT:*  Two grams.

    *THE COURT:*  Two grams.  So whatever the data on
therapeutic is, all the upper limits described in the
literature would inform a judgment about fatality.  And would
you tell her later what your foot note for 2 grams is.  That
is --

    *MS. SARGENT:*  Yes, Your Honor.

    *THE COURT:*  -- the source of that datum.  So, but the
testing is as to purity, sterility, and he listed several other
things.  And I don't know what "indicators of subpar or
otherwise problematic drugs" means.  That's a phrase in here.
And that's my problem.  I get a substantial volume of
abstractions.  And the State, I think, has staked out a fairly
narrow position, and that is, we did it and it's pure and we
use it within whatever the period is.  In this case it will be,

1  what, six months, eight?

2        *MS. STRATTON:*  Well, that's part of my issue, Your

3  Honor.

4        *THE COURT:*  Well, wait a minute.

5        *MS. STRATTON:*  Okay.

6        *THE COURT:*  So for this, it was late April.  Wasn't

7  it?  April 28th?

8        *MS. SARGENT:*  Five months.

9        *THE COURT:*  So, five months.  So, Mr. Williams needs

10  to know what happens to pentobarbital in -- I recall data on

11  its refrigeration.  Is that accurate?

12        *MS. SARGENT:*  As long as it's tested for sterility.

13  It can be stored up to 45 days.  Is that refrigerated?

14        *THE COURT:*  Yes, that --

15        *MS. HOWELL:*  As long as it's tested for sterility,

16  it's up to the professional judgment of the pharmacist as to

17  what the beyond use date should be according to --

18        *THE COURT:*  Wait a minute.  Speak up.  I can't --

19        *MS. HOWELL:*  Sorry.  If the sample has been tested for

20  sterility, it's up to the pharmacist, based on his professional

21  judgment and experience, to determine the appropriate beyond

22  use date.  It is not limited to 45 days.  It's not limited to 3

23  days or whatever the -- any other days.

24        *THE COURT:*  All right.

25        *MS. SARGENT:*  That's something their own expert opined

1  about.

2      THE COURT:  Would he say the same thing?

3      MS. SARGENT:  That's exactly what he said.  He

4  conceded that a beyond use date is based on the judgment -- the

5  professional judgment of the pharmacist who makes the drug.

6      THE COURT:  And that --

7      MS. STRATTON:  And depending on how it's stored.

8      THE COURT:  Well, that's -- I mean, it could be stored

9  in the sunlight.  I mean, there are probably lots of things you

10 could do to it.  But there's no evidence they're doing anything

11 other than whatever they say they're doing, which is -- and at

12 what temperature is it refrigerated?  38?

13     MS. HOWELL:  I do not know off the top of my head,

14 Your Honor.

15     THE COURT:  It's in this, wasn't it?

16          Now, both technicians say that the quality of the

17 active ingredient is pivotal to the quality of the final

18 product with the -- one of them, though, goes on to say that

19 all this talk about the things with which it is mixed.  Do we

20 know what Texas used to make it fluid -- that the pharmacy did?

21 It's water plus something.

22     MS. HOWELL:  There's no evidence of that, Your Honor.

23 We don't know.

24     THE COURT:  Okay.  Propylene glycol, alcohol,

25 hydrochloric acid, sodium hydroxide to make it -- I don't know

1    what tonicity is, and I didn't have time to look it up.  Does

2    anybody know what "tonicity" is?

3            MS. STRATTON:  No, Your Honor.

4            THE COURT:  And pH is -- I assume to have a neutral

5    pH, so it's either acidic or basic.  And solubility we know,

6    that's easy.

7                Do you know what he meant at the bottom of page 4

8    where he talked about quality improvement?  It's the last --

9            MS. STRATTON:  Of Dr. Ruble's report?

10           THE COURT:  Yes, ma'am.  Last line on page 4.

11           MS. STRATTON:  Last line on what page?

12           THE COURT:  Four.

13           MS. STRATTON:  Four.  Oh, I'm sorry, that's his CV.

14           THE COURT:  Do see it?

15           MS. STRATTON:  Quality improvement?

16           THE COURT:  Quality improvement.

17           MS. STRATTON:  I think he's just describing the

18   quality programs that --

19           THE COURT:  I know, but what does --

20           MS. STRATTON:  -- compounding -- oh, you mean because

21   he doesn't define it or describe it --

22           THE COURT:  Well, he lists things like quality

23   assurance and quality control.  And that's two things.  Testing

24   and good ingredients to start with.  Then he has quality

25   improvement within the same parentheses, and I have no idea

1  what that means.

2       *MS. STRATTON:*  I would imagine that he means how to

3  improve, by using the same word, the quality process they

4  already have in place, if there's ways to make it better.

5       *THE COURT:*  Now, that doesn't affect any particular

6  drug though.  So we're talking about something that's made.

7  It's made one way.  The idea that you can make it a different

8  way and be more efficient would be irrelevant to our problem.

9       *MS. STRATTON:*  Potentially.  But I think he's just

10  trying to talk about the compounding process in general, what

11  pharmacies should be doing.

12       *THE COURT:*  Do you understand that most old-fashioned

13  pharmacies, and I use one, so I don't know about modern chains

14  as much, compound drugs there in the store?

15       *MS. STRATTON:*  Yes, like I use it for my children.

16       *THE COURT:*  Where you get a compounded drug?

17       *MS. STRATTON:*  A lot of drugs that -- like babies

18  take, those are compounded in the pharmacy to put them in

19  liquid form because kids can't take a pill.

20       *THE COURT:*  Well, maybe healthy young people like you

21  don't use drugs.  Babies and I use drugs that apparently nobody

22  else uses, so they make it up.

23       And the Table 1 on the bottom of page 6 is fine.

24  It just doesn't tell us what we need to know, which is --

25       *MS. STRATTON:*  What happens after this --

1      *THE COURT:* Yeah, overnight they don't just blow up.

2           All right.  And, ma'am, on the advisory about the

3   execution date, I haven't had as much experience with Howell

4   and Sargent as I have with other people, but I believe I can

5   accurately recount to you that any time the State of Texas

6   thought it was putting a lot of pressure on me, turned out to

7   be sadly mistaken.  They have a job to do --

8      *MS. STRATTON:* Yes, sir.

9      *THE COURT:* -- and I'm going to do my job.  But them

10  deciding when to do their job -- remember this whole problem

11  came about because I decided it wasn't ripe and therefore

12  didn't apply the whole analysis that I did to Yowell.  It turns

13  out if I just decided an unripe case, apparently it would have

14  been fine, but -- so it wasn't ripe and then there -- and the

15  holding is, it wasn't ripe, and then there was a lot of talk

16  about other stuff.  But the holding was that the case was ripe.

17     *MS. STRATTON:* Yes, sir.

18     *THE COURT:* What difference does it make what county

19  Whitaker and Williams came from or how many other people from

20  Harris County are up there?

21     *MS. STRATTON:* What I understand of the process, Your

22  Honor, that I've learned from others, is that the State

23  typically chooses people that have been through their habeas

24  proceeding the longest to set their date of execution.  There

25  are a number of -- I believe 12 or 14 was the number that was

1  given me.  We did not list their names in here intentionally.

2          THE COURT:  I don't want --

3      MS. STRATTON:  But those are people that have been

4  through their habeas proceeding longer than Mr. Williams had

5  and --

6          THE COURT:  Well, only because it ended up getting

7  stayed in the first place.

8      MS. STRATTON:  I don't know what those presumptions

9  are, Your Honor.

10          THE COURT:  Well, we did Yowell a year and a half ago,

11  two years ago, didn't we?

12      MS. STRATTON:  Yes, in September of 2013.

13          THE COURT:  So it's not a rush.  Whatever it is doing,

14  that's not a rush.

15      MS. STRATTON:  You mean what the State is doing?

16          THE COURT:  Yes, ma'am.

17      MS. STRATTON:  Oh, I don't have in front of me the

18  date that Mr. Williams completed his habeas proceeding.

19          THE COURT:  Ma'am, I don't care.  The State of Texas

20  can take them in any order it wants to.

21      MS. SARGENT:  It's the decision of the trial judge and

22  the District Attorney's Office to set the dates.  It is their

23  strict prerogative under the Court of Criminal -- under the

24  Code of Criminal Procedure.  So --

25          THE COURT:  But the district judge has to sign the --

1    MS. SARGENT: He signs the order, yes. But he is the
2   one who has the exclusive province to choose the date. Often
3   there is input, yes, from the District Attorney's Office, but
4   they choose the dates when they want to choose them. And, yes,
5   most of them wait until the federal habeas proceedings are
6   concluded, but the number of months or years that a county
7   waits is dependent on perhaps a lot of factors.

8       THE COURT: Does the State tell the district attorney
9   when it's busy and when it has an opening?

10      MS. SARGENT: No.

11      THE COURT: All right. So, if Harris County signed 18
12  orders for the execution and the sheriff served the writs, you
13  would do all 18 of them the same day?

14      MS. SARGENT: No, absolutely not, Your Honor. There
15  is --

16      THE COURT: Well, what are you going to do? Disobey
17  the order?

18      MS. SARGENT: There is some -- well, in those cases,
19  due to the pressure that it would put on the prison system,
20  we've been through this before, if one county already has a
21  date and another county comes in and sets the date without
22  knowing about the first date, that date will be modified or
23  withdrawn and reset.

24      THE COURT: You hope.

25      MS. SARGENT: TDCJ, to my knowledge, has never carried

1 out two executions in the same night.

2    *THE COURT:* I know, but somebody has to ask the court

3 to modify their order.

4    *MS. SARGENT:* Yes.

5    *THE COURT:* You can't just --

6    *MS. SARGENT:* And oftentimes the prosecutor will go to

7 the Court in those instances and ask for a modification.

8    *THE COURT:* But it's not -- I mean, obviously Dallas,

9 Harris, and Bexar County produce the greatest number of

10 candidates, right?

11    *MS. SARGENT:* Yes.

12    *THE COURT:* I mean, Loving County only has 18 people

13 in it. So it's probably not a large consumer of your

14 resources. So you don't do it just because it's a new county,

15 do you? So if Colorado County, peace-loving county, ended up

16 having one, they wouldn't take precedence over everybody else?

17    *MS. SARGENT:* No.

18    *THE COURT:* Okay. You hope.

19    *MS. SARGENT:* I hope. But no one county takes

20 precedence over any other county, big or small. It's --

21    *THE COURT:* Well, if a Colorado County district judge

22 signs the order --

23    *MS. SARGENT:* If he signs the order first, then his

24 date is first. He gets the priority. If Harris County wants

25 to come in and sign an execution order for that same date,

1   Colorado County would have priority.

2       THE COURT:  Okay.  And, ma'am, the last line of that,

3   "All in contravention of the clear preferences of the Court of

4   Appeals for the Fifth Circuit," they held the case was ripe.

5   Yes, there's a lot of dictum in there.  I even understood the

6   dictum, but courts don't work by preferences.  They work by

7   holdings in cases affecting two people.

8       MS. STRATTON:  Your Honor, one of the issues that the

9   judges on the panel asked me during oral argument was about the

10  posturing of the case, meaning through an injunction proceeding

11  versus through after a trial on the merits, and that was the

12  purpose of that statement in the advisory, was that by having

13  set Mr. Williams for execution, the Court -- the State is

14  forcing our hands to potentially put this in an injunctive

15  posture versus a more traditional trial on the merits posture,

16  which --

17      THE COURT:  No, you don't have to do that.  You have

18  to move to stay it.  It's related to this case.  I have an

19  active case.

20      MS. STRATTON:  Then I make an oral motion to stay the

21  execution of Perry Williams.

22      THE COURT:  Well, but I asked for a description of an

23  alternative, and I got no answer to that, other than a

24  recitation of all the other mumbo jumbo about we have to see

25  whether the room was clean when the water was bottled to be

used medicinally and things like that.  I got a checklist of
details.  And so as near as I can tell, the pentobarbital is
fine.  The only question that Williams has, is how frequently
is it tested.  But before I'm going to make the State buy twice
as much pentobarbital, I need Mr. Ruble to actually answer the
question, which is what does four -- five months did you end up
calculating?

      *MS. SARGENT:*  Yes, five months.

      *THE COURT:*  What does a five month from testing, held
under the conditions that Texas uses, what is the quality,
sterility -- we don't have to worry about -- well, I guess
viscosity, the things both of them listed.  What is the effect
of the passage of five months on -- and I don't want to know it
makes it all terrible.  I want to know that -- and I don't
think, but I'm happy to hear what he has to say, that sterility
is the question here.  Now, it could be so horribly unsterile
at this point that it interferes with the drug, but I don't
understand that to be the purpose of the sterility test, but I
could be wrong.  Let him explain it.

      But basically we're talking about potency.  And
then he has to explain why a dose, when in a quarter times, if
I did the math right, the lethal dosage would not account for
and overcome a 23 percent loss of potency.  Do you understand?

      *MS. STRATTON:*  Yes.

      *THE COURT:*  I mean, that's what I've been asking for.

1  I want specific scientific data that make the arguments make

2  sense, since they both --

3       *MS. STRATTON:*  I don't know Mr. Ruble's answer to that

4  question off the top of my head.

5       *THE COURT:*  Well, no --

6       *MS. STRATTON:*  He may have provided it to us already.

7  And if he did provide it to us and did not include it in his

8  report, then I probably advised him to not put it in there,

9  because we were trying to specifically respond to your order.

10       *THE COURT:*  All right.  But that's what I need to

11  know.

12       *MS. STRATTON:*  Okay.

13       *THE COURT:*  If it is five months out of date and

14  there's this much of it, what would be the potency, sterility,

15  and other things.  Because if it's clear that the deterioration

16  rate -- and, again, we're, talking about lethal use and not

17  therapeutic use.

18       *MS. STRATTON:*  Right.

19       *THE COURT:*  And with therapeutic use, they usually

20  don't give you twice as much as you need and you usually have a

21  life expectancy somewhat longer, but -- and this is a

22  hypothetical question:  But does the protocol in use by Texas

23  include a backup injection?

24       *MS. SARGENT:*  A backup injection?  Yes.

25       *THE COURT:*  And what is it?

MS. SARGENT:  It's another 5 grams of pentobarbital.

THE COURT:  So more of the same?

MS. SARGENT:  Yes.

THE COURT:  So for all practical purposes, it's pentobarbital and water?

MS. SARGENT:  I assume so.

THE COURT:  Because the other stuff has to be very trace.  Would you please find out what are the -- water for solubility, but those other additives that everybody talked about to maintain a neutral acidity and diacid -- it's in the report.

MS. SARGENT:  Yeah, we talk about propylene glycol and some other things.

THE COURT:  That's for liquidity, I think, but just get the ingredients that are used to liquefy the pentobarbital.

MS. SARGENT:  Okay.

THE COURT:  It's his report.

(Judge conferring with law clerk.)

THE COURT:  I thought I marked it.  Propylene glycol, alcohol, hydrochloric acid, sodium hydroxide.  And I'll just look up tonicity myself.

You might ask Dr. Ruble whether the standards he insists apply to this complicated process obtain in pharmacies, regular retail pharmacies.

MS. STRATTON:  Whether the standards apply to retail

pharmacies?

     *THE COURT:* Well, whether they actually exist in them. Do retail pharmacies compound drugs for therapeutic purposes with laminar flow workbenches and all the other requirements that he insists that the State should make sure everybody does.

     *MS. STRATTON:* I'll ask him, Your Honor.

     *THE COURT:* Pardon?

     *MS. STRATTON:* I'll ask him. I believe that there's another set of provisions required for retail pharmacies, but I'll confirm with Mr. Ruble.

     *THE COURT:* Well, there are lots of footnotes to those requirements. I didn't look to see where they came from. But as I understand it, the director of the Texas prisons has the authority to change the means of execution; is that right?

     *MS. SARGENT:* Yes, so long as it remains within State law, which is lethal injection.

     *THE COURT:* All right. Well, that narrows it down. I didn't -- there's a whole range of things.

     *MS. SARGENT:* Yes. But currently our protocol has no alternative options.

     *THE COURT:* I was thinking maybe he was a Comanche, and he was going to tie him between two horses and things like that.

     *MS. SARGENT:* No, sir.

     *THE COURT:* All right. Will Texas kindly commit to

1  the Court that there will be no change in the protocol for

2  Williams that has been furnished to Ms. Stratton?

3       *MS. SARGENT:*  As long as it takes place on its

4  scheduled date of September 29th.

5       *THE COURT:*  No, I don't mean forever, but --

6       *MS. SARGENT:*  Yeah.

7       *THE COURT:*  Is that enough?

8       *MS. STRATTON:*  For Mr. Williams, that satisfies his

9  due process claim, with the exception of whether or not his

10 Eighth Amendment claim can be prosecuted within the timeline

11 between now and September 29th.

12      *THE COURT:*  His which amendment?

13      *MS. STRATTON:*  His Eighth Amendment claim.

14      *THE COURT:*  All right.  That's all I'm worried about.

15 But I don't want to make you answer a bunch of questions about

16 pentobarbital and discover that they're going to use rancid

17 grapefruit juice.

18      *MS. STRATTON:*  Understood.

19      *THE COURT:*  You know, I want a stationary target.  And

20 then I want your people to get specific.  I've had all of the

21 abstractions and three levels of synonyms.  That won't help me.

22 We're talking about a very specific concrete event, not the

23 process of compounding pharmacies in the world.  He told me a

24 lot about compounding, nothing that I didn't much already know,

25 except all the citations.  He only indicated that there could

1  be all these problems, but he gave me no dimension of the

2  problem.

3      MS. STRATTON:  I understand where you're coming from,

4  Your Honor, I do.

5      THE COURT:  He had a, what, five column by four row

6  chart that explained all those dates and temperatures and

7  things and then in the text that either precedes it or follows

8  it, he said, of course, the best use date is the pharmacist's

9  professional decision, which wipes out the specificity of the

10 chart.

11     MS. STRATTON:  But one of the issues that we've

12 learned, Your Honor, begs the question of the pharmacist's

13 decision, because we've -- not us personally, but through

14 public information reports, other death sentence inmates have

15 learned that the same set of drugs that will be used

16 purportedly to execute Mr. Yowell -- I'm sorry, Mr. Williams,

17 got myself off by a couple years, will -- the beyond use date

18 has changed from one date to a date eight months longer, and I

19 don't understand why that -- how that's possible.

20     THE COURT:  I read that.  It doesn't matter at least

21 until Dr. Ruble tells me what difference five versus one and a

22 half makes.

23     MS. STRATTON:  Okay.  Understood.

24     THE COURT:  I mean, that's the problem.

25     MS. SARGENT:  Your Honor, if I may --

1       *THE COURT:* It's not --

2       *MS. SARGENT:* -- the last execution that Texas carried

3 out on August 12th was done with the same batch of

4 pentobarbital that will be used to execute Mr. Williams on

5 September 29th, and there were absolutely no problems. It went

6 off as every other execution has gone off in the last three

7 years.

8       *THE COURT:* And how long was his treatment time?

9       *MS. SARGENT:* 15 minutes.

10       *THE COURT:* Is that on your chart?

11       *MS. SARGENT:* It's on the chart that was attached to

12 Exhibit A of our discovery -- opposition to their discovery

13 request.

14       *THE COURT:* Ms. Stratton, would you like for me to

15 have Whitaker and Williams here at the next conference?

16       *MS. STRATTON:* That's up to you, Your Honor.

17       *THE COURT:* Well, do you want --

18       *MS. STRATTON:* I mean, I'm sure they wouldn't mind

19 getting out of jail for a day, but, I mean, I don't know that

20 it's necessary to answer your questions, but if you would like

21 them here, then that's fine.

22       *THE COURT:* Well, I'm concerned that they're not -- I

23 understand that, you know, they're convicted murderers, and I

24 don't remember anything about their background. I think

25 somebody owes them the courtesy of talking to them. Lawyers

1  can visit death row people, right?

2          MS. SARGENT:  Absolutely, all the time.

3          THE COURT:  Now, the State doesn't want me to bring

4  them.

5          MS. SARGENT:  Your Honor, we have no position on that.

6  If you would like to have them present, that's totally fine.

7          THE COURT:  I was instrumental in helping us get the

8  Spears hearings so you didn't have to bring -- at odd occasions

9  have prisoners brought down.

10          MS. SARGENT:  Sure.

11          THE COURT:  And we just -- and I went to the prison

12  with the marshal and the court reporter and the law clerk.  We

13  had the unit warden, the unit doctor, and some other

14  administrative person.

15          MS. HOWELL:  Usually the grievance coordinator, Your

16  Honor.  I was there with you.

17          THE COURT:  You don't look that old.  But

18  jurisprudence has cut the volume of those substantially.  So I

19  haven't been in probably ten years.  I'm perfectly willing.  I

20  thought it was a great program.  Most of them could be solved

21  with just a friendly conversation with the guy.

22          And my favorite one was when this guy's complaint

23  was that a guard had come into his cell and he had -- the

24  prisoner had drawn satanic symbols on his laundry bag and two

25  pillow cases.  And the guard expressed some Christian

disapproval of satanic symbols and shredded them. And so I said, "Well, what's a laundry bag go for?" And he said, "3.50." "And a pillow case at the commissary?" "$2." So I turned to the warden and said, "Give the man $7 for two pillow cases and a laundry bag." And probably Ms. Howell, she was a lot younger then, jumped up and said, "We object. We refuse to settle cases like this. We're not settling anything." And I said, "Lady, your gasoline coming to Huntsville from Austin is more than settling this case." And she started talk again and the warden said, "Shut up." It just -- and a lot of them, you just chat with them a minute, and they say, "I was mad back then, but it's no big thing," and it would go away. It is a lot more efficient than having law clerks do those all the time.

So after you talk to Dr. Ruble about something that will pass the *Daubert* test by testimony -- just saying things can go wrong, we're all going to die, will not allow him either to testify at all or persuade me. But after that, how many days do you think it would take to discuss with, as near as I can tell, Ruble and Fout?

MS. STRATTON: If I can reach him today, I'll reach him today. He's in Utah.

(*Judge conferring with case manager.*)

THE COURT: Three minutes.

(*Recess from 3:29 p.m. to 3:32 p.m.*)

1    *THE COURT:*  Thank you.  Be seated.

2                All right.  Did I leave you all with a question

3    on the floor?

4        *MS. STRATTON:*  You did, and I have to recall, Your

5    Honor, I don't know what it was.  I was in the middle of

6    answering it, I think.

7        *THE COURT:*  All right.  Well, I'll take that as a good

8    answer and we'll move on.  All right.

9                Oh, I know what it was.  How long do you suspect

10   it will take --

11       *MS. STRATTON:*  Oh, yes.

12       *THE COURT:*  -- to discuss the intricacies of

13   pentobarbital?  I'm not going to listen to Fout or Ruble make

14   speeches about anything.  But in your case Ruble will have to

15   answer direct questions about science and stuff, not the kind

16   of stuff he's been giving us.  I mean, it's about his

17   background, but that doesn't answer the question.

18               And similarly, Fout is going to have to answer

19   direct questions from you-all and gracefully prepared cross

20   questions from her, and both of them will have to take cranky

21   cross questions from me.  Have we got the process down?  Are

22   there any other witnesses you can think of besides the two of

23   them?

24       *MS. SARGENT:*  Does that mean we're going -- are we

25   talking about a hearing, or are we talking -- I'm sorry, Your

1 Honor.

2     *THE COURT:* Well, we're talking about having a factual

3 determination like Williams wants before he dies.

4     So, Ms. Stratton, who besides the two technicians

5 do you think have something usefully cogent and precise that we

6 should hear from?

7     *MS. STRATTON:* I think the State should bring a

8 corporate representative for better purposes.

9     *MS. SARGENT:* A corporate representative from who?

10     *MS. STRATTON:* The TDCJ.

11     *THE COURT:* About what? What do you ask of them?

12     *MS. STRATTON:* Well, I would like to be able to apply

13 what Dr. Ruble has to -- you know, his opinions about the

14 facts --

15     *THE COURT:* We're going to give you some data, but

16 we're not -- I don't care what Deputy Zarina of something there

17 thinks about stuff. I'm not applying its policy or Williams'

18 policy. I'm applying the law to a process that we're going to

19 define to see whether it's unreasonably cruel. Right?

20     *MS. STRATTON:* Understood, Your Honor. But I think

21 that there are facts that we don't know.

22     *THE COURT:* Name the fact.

23     *MS. STRATTON:* I mean, I think I've listed them in

24 Paragraph 15 of our motion for discovery. I mean, there are

25 things about how the State procures the drug.

1    *THE COURT:*  No, ma'am.  If it tests pure, the
2  antecedent and facilities are irrelevant.

3    *MS. STRATTON:*  Okay.  I understand what you're saying,
4  Your Honor.  I think we're just going to have to agree to
5  disagree, but I understand.

6    *THE COURT:*  All right.  Well, that's a ruling.  Both
7  of the experts have said if it tests pure, that determines its
8  usefulness.  Now, they have the same sort of opinions about
9  what's supposed to happen before, but if it's not diseased when
10 the prison gets it, it wasn't diseased in any significant way
11 en route to the prison.  He's not going to be hurt by something
12 that happened by the people distilling the alcohol that may be
13 an additive.  He's hurt because of the compound that arrives at
14 the prison being injected.  So if it's chemically pure, to the
15 extent we know exactly what that means, and sterile and you
16 need -- I don't know whether Ruble can do it, but perhaps he
17 can with his knowledge, that the idea about needing an answer
18 on does sterility matter given the difficult circumstances of
19 its use here.

20        All right.  And so I don't know why we need more
21 than two days, do you?

22    *MS. STRATTON:*  No, I would be happy for two days, Your
23 Honor.

24    *THE COURT:*  All right.  Does Texas see why it would
25 take more than two days?

1          *MS. SARGENT:*  No, Your Honor.

2          *THE COURT:*  All right.  Now, I'm not sure I'm going to

3     be able to -- now, I'll try to detail in an order what we've

4     talked about this afternoon, but you've got the gist of it.  I

5     need some explanation of exactly how much deterioration and

6     which quality he thinks is important would cause under these

7     uses suffering.  So we now know that the backup is the same

8     stuff, from the same batch.  So the test of this should be the

9     test of that.  Is that all right?

10         *MS. STRATTON:*  That's my understanding, yes.

11         *THE COURT:*  All right.  So right promptly, like 3:00

12    o'clock Thursday, Stratton needs a document that shows what

13    besides pentobarbital and water are components of this batch.

14    The compounding pharmacy clearly will have the record.  You can

15    cut their name off of it and have your corporate representative

16    certify in their own blood that that is the record from the

17    compounding pharmacy.  I don't want you to identify the

18    pharmacy.  Do they already know -- do you know?  Ms. Stratton,

19    do you know who's compounding it?

20         *MS. STRATTON:*  No, Your Honor.  That information has

21    been kept confidential by the State.

22         *THE COURT:*  Yes, for reasons of public safety of

23    pharmacists.

24         *MS. STRATTON:*  That's the State's position, yes.

25         *THE COURT:*  Pardon?

1    *MS. STRATTON:*  I said, yes, that's my understanding.

2    *THE COURT:*  Yes.  And in this case alone we've had

3    evidence that that's not a fictitious use of public safety.

4    *MS. STRATTON:*  And, Your Honor, are you asking the

5    State to -- I would assume that Dr. Ruble would need to know

6    more than just what the components are, but the amounts of

7    those components.

8    *THE COURT:*  Well, it should be in there.

9    *MS. STRATTON:*  I just wanted to clarify.

10   *THE COURT:*  I mean, the compounding pharmacy knows

11   what they put in there and how much of it, so --

12   *MS. STRATTON:*  And you said by Thursday at 3:00 p.m.?

13   *THE COURT:*  Yes.  Computers are a wonderful thing.

14   Also, Stratton needs to have the complete protocol from what

15   has been done about Williams and is intended to be.  Now, I

16   don't think anything other than the selection of the drug and

17   the date has been done, right?

18   *MS. SARGENT:*  Are you --

19   *THE COURT:*  Is there anything Williams specific about

20   the proposed execution?

21   *MS. SARGENT:*  No.  The protocol is the same for each

22   and every execution.  So there was a copy of the protocol

23   attached to my opposition to their motion for discovery.

24   *THE COURT:*  Okay.

25   *MS. STRATTON:*  I have it, Your Honor.

1    *THE COURT:*  All right.

2    *MS. STRATTON:*  It's the same protocol the State's had

3    in place since 2012.

4    *THE COURT:*  Well, it works.  And the State has

5    committed not to change the drug or the protocol, right --

6    *MS. HOWELL:*  That is correct, Your Honor.

7    *MS. SARGENT:*  Yes.

8    *THE COURT:*  -- for this date for Mr. Williams.

9    Ms. Stratton, if there's a fact that you or Ruble

10   or anybody else for Mr. Williams needs to know, if you will

11   write in the middle of a piece of paper what the fact is, it

12   can be a question, but it would be what percentage of

13   something -- I don't want to know contention or policy or any

14   of that stuff.  But if there is a datum that somebody thinks

15   they need for Mr. Williams, send a nice, neat letter saying,

16   "Would you please send us the attached datum," and send it to

17   them.

18   *MS. STRATTON:*  Okay.

19   *THE COURT:*  And then -- it's like a request for

20   admissions, but she would take eight pages to put the caption

21   on a request for admission.  And then you get to answer and

22   sign it and send it back to her.  And you can write it on the

23   same page in your handwriting for all I care, but get her the

24   data.  And if you think it's intrusive or emotionally offensive

25   or whatever you think about the data, then send her and my case

1  manager an e-mail that says, "We do not believe that that's a
2  proper inquiry."

3            MS. SARGENT:  So to a certain extent you're granting
4  their discovery request?  Is that what I'm understanding?

5            THE COURT:  No, I'm not touching that thing.

6            MS. SARGENT:  Okay.

7            THE COURT:  It goes on for pages and miles.  I'm
8  telling the State what it wants to do.

9            MS. SARGENT:  Okay.

10           THE COURT:  And it wants to do it.  Is that clear?

11           MS. SARGENT:  Yes.  I just wanted to be clear, Your
12  Honor.

13           THE COURT:  I'm letting them ask you -- it's a
14  practice I indulged in years ago when I was a lawyer.  I would
15  send requests for admissions, but it didn't have a lot of stuff
16  and just said, Charlie, I think this is undisputed.  Would your
17  client stipulate that, and then a fact, love, Lynn.

18           MS. STRATTON:  I understand, Your Honor.

19           THE COURT:  And so I just want the information to you.
20  And if we need to put red ribbons and gold seals on it in a
21  little while, we will.

22           MS. STRATTON:  I understand.  I believe you've
23  articulated your limitations as to what you're inquiring about,
24  and I will do my best to make sure that the information I ask,
25  if any, is within that framework.

*THE COURT:* And it all has to do it promptly. If I'm really confused about what y'all are talking about, I'll get both of you on the phone and have a court reporter there and we'll just have a hearing on discovery. I'm not inviting a lot, but you may stumble across something that we haven't thought of, I can't believe with four of the smartest people in the country, but it could happen.

We're going to be able to assure Mr. Williams, through his learned counsel, that the process employed to kill him is not constitutionally cruel, which does not mean it won't bother him or if they have to stab him with a needle three times -- the only person I've ever had that happen was at the U.T. student medical clinic when I was in law school. I finally decided, ma'am, I'll come back or just die. I'm in more danger of dying from the blood withdrawal than I am with whatever it is I have.

But the object here is clear and it's narrow. That there's a lot of talk in the case, but it's a very simple transaction. On a day next month, the State wants to kill Mr. Williams. They're going to do it in a way that's being disclosed in advance, so that everybody is assured that it will not be cruel.

Anything else we can achieve here?

*MS. STRATTON:* Your Honor, do you have a deadline by which I need to have Mr. Ruble answer your questions?

1          THE COURT:  Pretty quickly, because the trial will be
2   September 9th and 10th.
3          MS. STRATTON:  9th and 10th.  Okay.
4          THE COURT:  I can do it almost any weekend.
5          MS. STRATTON:  Pardon?
6          THE COURT:  I can do it almost any weekend.
7          MS. STRATTON:  Well, if that could get me away from my
8   children, I wouldn't complain.
9          THE COURT:  You know after Hurricane Ike --
10         MS. STRATTON:  Except they're about to start school,
11  so...
12         THE COURT:  After Hurricane Ike and our staff were
13  trapped at home with their children for six, eight, ten days,
14  no electricity, they were so happy to have their jobs.  They
15  came back with big grins on their face, because they were some
16  place not with their children and no air conditioning.
17         Do you know Judge Lynn in Dallas?  Barbara Lynn?
18         MS. STRATTON:  I have not had any -- only Judge Lynn
19  in bankruptcy court, not the other judge.
20         THE COURT:  Well, I tried her last case before she
21  ascended over Labor Day weekend.  It was, strangely enough, a
22  real emergency copyright case.
23         MS. SARGENT:  Your Honor, may I interrupt just a
24  moment.  Ms. Howell is on a vacation, a preplanned vacation,
25  and will not be available the 9th and 10th.  And we are

wondering if we could move the hearing to the 14th, the
following Monday and Tuesday.

    *THE COURT:*  One of us is working on a very tight
schedule.

    *MS. SARGENT:*  I understand that, Your Honor.

    *THE COURT:*  And as much as I would like to have her,
Paxton's got a whole building full of people.  You need to get
one of them and beat some sense into them.

    *MS. HOWELL:*  We'll do that, Your Honor.

    *THE COURT:*  Because I don't want somebody coming down
here and acting like they're from the Justice Department of the
United States.

    *MS. HOWELL:*  We will avoid that.

    *THE COURT:*  We're from Washington and we're here to
tell you hicks what's going on.

    Ms. Stratton, anything else?

    *MS. STRATTON:*  No.

    *THE COURT:*  Now, I don't invite it, but if you-all
should somehow get at cross-purposes, I want to know within 30
minutes.

    *MS. STRATTON:*  Fair enough.

    *THE COURT:*  Because we're going to do this.  We're
going to do it right.  But everybody needs to know.

    *MS. STRATTON:*  Understood.

    *MS. SARGENT:*  Yes, Your Honor.

1      THE COURT: Unfortunately I usually close my death

2   penalty opinions with a quote from Tom Clark in the Greenberg

3   spy case.  Our burden is heavy, but our duty is clear.  I'm

4   going to do my duty as soon as I can see it.

5              All right.  Anything else?

6         MS. STRATTON: Nothing from me, Your Honor.

7         MS. SARGENT: No, Your Honor.

8      (Concluded at 3:58 p.m.)

9                          * * *

10  I certify that the foregoing is a correct transcript from the

11  record of proceedings in the above-entitled cause, to the best

12  of my ability.

13

14  /s/ *Kathy L. Metzger*                    *8-27-2015*

    Kathy L. Metzger                    Date

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25