1               UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF TEXAS

3                     HOUSTON DIVISION

4   THOMAS WHITAKER, et. al.,           .
                                        .
5                 Plaintiffs,           .
                                        .   Civil Action
6   VS.                                 .   No. H-13-CV-2901
                                        .
7   BRAD LIVINGSTON, et. al.,           .   Houston, Texas
                                        .   September 4, 2015
8                 Defendants.           .   9:44 a.m.
                                        .
9   . . . . . . . . . . . . . . . . . . .

10                  TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE LYNN N. HUGHES
11                        HEARING

12  APPEARANCES:

13  FOR THE PLAINTIFFS:

14          Ms. Bobbie L. Stratton
            Ms. Valerie Anne Henderson
15          Ms. Jessica Alison Hinkie
            BAKER DONELSON
16          1301 McKinney
            Suite 3700
17          Houston, Texas 77010
            713.650.9700
18          FAX:  713.650.9701
            bstratton@bakerdonelson.com
19          vhenderson@bakerdonelson.com
            jhinkie@bakerdonelson.com
20
            Ms. Maurie Amanda Levin
21          ATTORNEY AT LAW
            614 South 4th Street
22          #346
            Philadelphia, Pennsylvania  19147
23          512.294.1540
            FAX:  512.733.9225
24          maurielevin@gmail.com

25          PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
        TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION

```
 1                          APPEARANCES

 2                          (continued)

 3   FOR THE DEFENDANTS:

 4          Mr. Matthew Dennis Ottoway
            Mr. Jefferson David Clendenin
 5          OFFICE OF THE ATTORNEY GENERAL OF TEXAS
            PO Box 12548
 6          Austin, Texas  78711
            512.463.7463
 7          512.936.1400
            FAX:  512.320.8132
 8          matthew.ottoway@texasattorneygeneral.gov
            Jay.Clendenin@texasattorneygeneral.gov
 9

10

11

12   COURT REPORTER:

13          GAYLE L. DYE, CSR, RDR, CRR
            515 Rusk, Room 8016
14          Houston, Texas  77002
            713.250.5582
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                            PROCEEDINGS
 2                        September 4, 2015
 3               THE COURT:  Good morning.
 4               MS. STRATTON:  Good morning.
 5               MR. OTTOWAY:  Good morning.
 6               THE COURT:  What is the precise status of
 7   Mr. Williams' execution schedule?
 8               MR. OTTOWAY:  Your Honor --
 9               MS. STRATTON:  Your Honor, I mean, I suppose either of
10   us can go.  The Court ordered that the previously pending date
11   of September 29th is no longer effective.  I'm using the wrong
12   words; but as of this morning, unless Mr. Ottoway tells us
13   different, the State has not sought another date to reset his
14   execution.
15               THE COURT:  Why doesn't -- he should know, shouldn't
16   he?
17               MS. STRATTON:  I haven't asked him before we started
18   the hearing, so I don't know.
19               THE COURT:  Do you know what you're doing?
20               MR. OTTOWAY:  I do, your Honor.
21               THE COURT:  That's the first question.
22               MR. OTTOWAY:  No.  I will say for purposes of setting
23   execution dates, that's entirely controlled by the District
24   Attorney's Offices.
25               THE COURT:  Who is a State officer.
```

09:43:54  (line 5)
09:44:17  (line 10)
09:44:38  (line 15)
09:44:48  (line 20)
09:44:59  (line 25)

1              MR. OTTOWAY:  You're absolutely right, your Honor.

2     And currently, there is no execution date.  There has been no

3     attempt to set a new execution date.  The execution order and

4     warrant have been withdrawn entirely.

09:45:15  5              THE COURT:  All right.  Is there a plan underlying

6     this or are these just random occurrences by the great State of

7     Texas?

8              MR. OTTOWAY:  Your Honor, I believe that when it was

9     discovered that an attorney may have been representing him

09:45:36 10     disclosed that he, indeed, was not representing Mr. Williams,

11     that is when the State moved to appoint Mr. Williams an attorney

12     for purposes of any additional post-conviction litigation he

13     might have; and at that time, we moved for appointment; and that

14     is the reason why it was withdrawn, your Honor.

09:45:57 15              THE COURT:  All right.  Who appointed the counsel?

16              MR. OTTOWAY:  I believe it was Judge Gilmore, your

17     Honor.

18              THE COURT:  Wait a minute.

19              MS. LEVIN:  If I may, your Honor?

09:46:13 20              THE COURT:  Ms. Stratton is taking the lead for a

21     moment.

22              Do you know what happened downstairs?

23              MS. STRATTON:  My understanding -- Ms. Levin attended

24     the teleconference of the hearing.  I was not personally

09:46:26 25     present.  My understanding is that counsel was not appointed at

1    that time.

2            THE COURT:  I don't know -- I'm not questioning her

3    about it.  I don't know how Judge Gilmore can appoint a lawyer

4    in a closed case.

09:46:43    5            MS. STRATTON:  And I think that's why an attorney was

6    not appointed.  That's my understanding.

7                    No?  Okay.

8                    Ms. Levin is shaking her head at me so I'd like

9    to ask her if she can answer the Court's question, if you --

09:46:58   10            THE COURT:  Yes, ma'am.

11            MS. LEVIN:  A correction to Mr. Ottoway's statement --

12            THE COURT:  No, ma'am.  Tell me the facts and don't

13    talk about him.  He's funny looking and not prepared.

14            MS. LEVIN:  Mr. Williams was without counsel, has --

09:47:11   15            THE COURT:  Ma'am, is there a new counsel appointed;

16    and if so, by whom?

17            MS. LEVIN:  Yesterday, Judge Gilmore appointed Seth

18    Kretzer.

19            THE COURT:  And is he here in Houston?

09:47:28   20            MS. LEVIN:  No, your Honor.

21            THE COURT:  Where is he?

22            MS. LEVIN:  I don't know.

23            THE COURT:  I think my staff has just gone to find

24    out.

09:48:08   25                    Mr. Williams has been getting all the attention.


                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  Is there currently a date in the offing for Mr. Whitaker?

2           MR. OTTOWAY:  Your Honor, I am counsel for Respondent

3  in Mr. Whitaker's federal habeas case.  Currently, he has a

4  59(e) motion pending.  So, there is no date at all.

09:48:30  5           THE COURT:  When you say 59(e)?

6           MR. OTTOWAY:  A Rule 59(e) motion, your Honor.  I'm

7  sorry, a motion for new --

8           THE COURT:  Motion for new trial.

9           MR. OTTOWAY:  Yes, your Honor.

09:48:41  10           THE COURT:  Just say that.

11           MR. OTTOWAY:  I apologize.

12           THE COURT:  You talk like a bankruptcy lawyer.

13  Chapter 7, Rule 46B.00A4(a).  Is it the State's position that

14  the date will not be set until that's ruled upon?

09:49:04  15           MR. OTTOWAY:  Your Honor, my understanding of the

16  policy of Harris County with respect to setting dates is,

17  typically, all Supreme Court litigation ceases from the federal

18  habeas proceeding before they seek to set a date.

19           THE COURT:  And where does Whitaker's petition for a

09:49:28  20  habeas corpus lie?

21           MR. OTTOWAY:  With respect to Mr. Whitaker, the motion

22  for new trial is currently pending, so he has not even made it

23  to the Fifth Circuit for purposes of a certificate of

24  appealability, your Honor.  So, he has the Fifth Circuit and

09:49:48  25  then the Supreme Court.

1          THE COURT:  What judge has it?

2          MR. OTTOWAY:  Judge Ellison, I believe, your Honor.

3          THE COURT:  All right.

4              Ms. Stratton, I have a list of things I want to

09:50:16    5  discuss.  What would you like to discuss?

6          MS. STRATTON:  Your Honor, we have a couple of

7  discovery issues.

8          THE COURT:  Would you come up here?

9          MS. STRATTON:  Yes.

09:50:30   10          THE COURT:  Ms. Feltz is trying to hear all this, and

11  it works better in a big room if she can hear you.

12          MS. STRATTON:  Okay.  We have --

13          THE COURT:  Lower.  Lower.

14          MS. STRATTON:  -- a couple of -- can you see me now?

09:50:44   15              Okay.  I'm not very tall.  There is a couple of

16  outstanding discovery issues that we would like to bring to the

17  Court's attention.  We also want to talk about the status of the

18  current complaint following the Glossip opinion, and we need to

19  talk about scheduling.  Those are what are on my short list.

09:51:06   20          THE COURT:  All right.  What sort of discovery are we

21  going to talk about?

22          MS. STRATTON:  Pursuant to your last order, I sent a

23  letter requesting particular factual information to Mr. Ottoway.

24  They responded.  We had a discovery conference, agreed to

09:51:23   25  disagree on a couple of items; and there are a couple of items

1    that we wanted to bring to the Court's attention for a ruling.

2              THE COURT:  What is number one --

3              MS. STRATTON:  Number one --

4              THE COURT:  -- preferably in the order of

09:51:38    5    significance, not in the order of you happened to write them

6    down?

7              MS. STRATTON:  In the order of significance, I would

8    say number one and two are pretty close, first and second.  So,

9    the first item is every compounding pharmacy, when they prepare

09:52:01    10   a particular drug, has what's called a master formulation

11   record.

12              In response to the Court's order, when the

13   Defendants disclosed the formula for the compounded

14   pentobarbital, what they provided in their pleading was a subset

09:52:17    15   of the master formulation record.  We would like to see an

16   appropriately redacted copy of the formulation record itself.

17              And Mr. Ottoway has told me that the pharmacy

18   will not produce it because it's proprietary.

19              THE COURT:  I think somebody needs to look at it.

09:52:51    20             MS. STRATTON:  Dr. Ruble would most certainly like to

21   look at it.

22              THE COURT:  Not my first choice for a disinterested

23   person.

24              MS. STRATTON:  Oh, in terms of discoverability,

09:53:06    25   understood, your Honor.

1          THE COURT:  You know, I don't want their names on

2     stuff.  I don't want their trade secrets out.  I take it your

3     pharmacological knowledge is limited?

4          MS. STRATTON:  That is correct, your Honor.

09:53:24  5          THE COURT:  Ms. Hinkie, did you take organic

6     chemistry?

7          MS. HINKIE:  I did not, your Honor.  That's why I went

8     to law school.

9          THE COURT:  Most people who do apparently take it

09:53:38  10    twice, as I understand -- I didn't either.

11               Let me think about that.

12          MS. STRATTON:  Okay.

13          THE COURT:  What's number two and half or --

14          MS. STRATTON:  Number two and half is in the -- I

09:53:54  15    forget which response it was.  Oh, the same response to the case

16    management order.  The Defendants disclosed the means to get the

17    batch of drugs from the pharmacy to the prison.  In there, they

18    disclosed that it's taken by air-conditioned vehicle from the

19    pharmacy to the prison.

09:54:18  20               And I asked for the time that it's in the car

21    because the time that the drug is not in cold temperature

22    affects the degradation.  And they told me they wouldn't tell me

23    what it was because that would --

24          THE COURT:  It would reveal the speed the driver --

09:54:43  25          MS. STRATTON:  -- narrow -- I did not ask at what

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    speed he was -- the driver was driving.

2            THE COURT:  If you have the time, you can work

3    backwards.

4            MS. STRATTON:  And their concern was that it would be

09:54:54   5    able to narrow down the possibility -- the possible number of

6    pharmacies.  I then asked if we could get a range, you know,

7    that maybe not -- wouldn't disclose to me is it in Dallas or

8    Houston, you know, or whatever; and they still thought that that

9    was not appropriate.

09:55:13   10           THE COURT:  Mr. Ottoway, they pick it up, put it in an

11    air-conditioned car, and drive it?

12           MR. OTTOWAY:  That is correct, your Honor.

13           THE COURT:  And when they stop in Denver on the way

14    back overnight, do they put it in the motel room that is air

09:55:41   15    conditioned?

16           MR. OTTOWAY:  I cannot speak to the location where

17    they obtain it, your Honor.

18           THE COURT:  I understand that.  I'm assuming that -- I

19    invented Denver so you wouldn't --

09:55:51   20           MR. OTTOWAY:  Your Honor, I believe we've disclosed

21    that we obtain it in state.

22           THE COURT:  Maybe the driver's not good and he goes --

23    so, you do not believe that there is an overnight rest?

24           MR. OTTOWAY:  Oh, there was another request and they

09:56:12   25    asked whether there was any other stops, I believe.  That was

1  one of the requests in your discovery letter, and we disclosed

2  that there was a short stop for food.

3            MS. STRATTON:  That's correct.

4            THE COURT:  Okay, that's enough.

09:56:31  5            MS. STRATTON:  That's enough for me to know?  I mean,

6  you're denying my request to have them answer the question?

7            THE COURT:  Yes, ma'am.  And that actually bleeds into

8  one of my topics.

9            MS. STRATTON:  Okay.  And then, my third item on the

09:56:47  10  list was we had asked for a copy of what's called a certificate

11  of analysis.  The certificate of analysis is a report from the

12  compounded pharmacy about, amongst other things, the purity of

13  the API that is used to make the drug.

14            THE COURT:  I thought we had covered that.

09:57:10  15            MS. STRATTON:  It's not the same thing as the master

16  formulation record.

17            THE COURT:  No.  But there is a post-compounding

18  analysis test of the drug.

19            MS. STRATTON:  That's correct.

09:57:30  20            THE COURT:  And if the principal ingredient were

21  defective before it was compounded, it would be defective after

22  -- even Ruble says that.  That's why the insistence on going

23  further and further back makes no sense.

24                 If, after they liquify the drug, they test it and

09:58:00  25  if the active ingredient is good then, that's the only question

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    that we have to worry about.

2            MS. STRATTON:  I know I'm not going to articulate

3    myself very well.  Dr. Ruble has explained to me there's more to

4    it than that.  But it's not quite that simple but --

09:58:17   5            THE COURT:  He is not that articulate because, having

6    read his reports multiple times, it does not follow.

7            MS. STRATTON:  Fair enough.  Those were the only

8    outstanding discovery items that we could not agree on, your

9    Honor.

09:58:41  10            THE COURT:  Well, there's one you forgot to ask.

11            MS. STRATTON:  Which was that?

12            THE COURT:  The age of the pentobarbital injectable --

13    that's good English.  Is that good English?

14            MS. STRATTON:  You're correct, your Honor.

09:59:02  15            THE COURT:  -- the compound.

16            MS. STRATTON:  We didn't ask that question.  And

17    partly, the reason they didn't ask that question was because of

18    the Court's previous ruling on the date of the Eagle Labs

19    report.  But --

09:59:16  20            THE COURT:  No, wait.  This is a different problem.

21            MS. STRATTON:  Okay.

22            THE COURT:  I would like Texas to disclose the data

23    compounding for the 18 historic injections.  We know the

24    consequences of those injections.

09:59:44  25            MR. OTTOWAY:  If I may, your Honor, are we talking

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  about injections that we've used previously from compounding

2  pharmacies?

3          THE COURT:  I thought -- there are eight?  I thought

4  there were 18.

09:59:55  5          MR. OTTOWAY:  I was only confused.  I believe there's

6  more than that.

7          MS. STRATTON:  I believe it's 24.

8          MR. OTTOWAY:  I believe it's 26.

9          MS. STRATTON:  Oh.  It's at least in the twenties.

10:00:07  10          MR. OTTOWAY:  I wanted to just clarify, your Honor.

11          THE COURT:  Yes.  I have a table somewhere.  But

12  what's not on the table is the length of time from compounding

13  to injection; and I think, since we have some real data as

14  opposed to hypotheses, let's get the operating data.

10:00:28  15          MR. OTTOWAY:  Your Honor, would you allow me to --

16          THE COURT:  26?

17          MS. STRATTON:  24 or 26.

18          MR. OTTOWAY:  26, I believe, your Honor.

19          THE COURT:  All of them.

10:00:41  20          MR. OTTOWAY:  If you want to finish with Ms. Stratton

21  first, I do have some objections with respect to any further

22  disclosures on that, if you would like to entertain those now

23  or --

24          THE COURT:  You're objecting to my discovery request?

10:00:56  25          MR. OTTOWAY:  Well, I have an alternative process that

1    I would like to explore with the Court as far as this particular

2    case.

3              THE COURT:  All right.  But partially, I'm trying to

4    solve the problem globally because -- were you here last time?

10:01:17   5              MR. OTTOWAY:  I was not, your Honor.

6              THE COURT:  Well, I think Ms. Stratton and I agreed

7    that there's no acceptable answer.

8                   Didn't we?

9              MS. STRATTON:  I think so.

10:01:28  10              THE COURT:  And so, if I can lay the groundwork for

11   clarity and some precision with historic data, it might help

12   people like Ms. Stratton formulate a better strategy or a

13   completely different one and save other judges and lawyers for

14   the State going through the process of figuring out exactly what

10:01:55  15   we've been doing and how we've been doing it.

16              MR. OTTOWAY:  Certainly understand, your Honor.

17   However --

18              THE COURT:  All right.  Is that it on discovery?

19              MS. STRATTON:  For me it is, your Honor.

10:02:04  20              THE COURT:  Okay.  Let me see what he's talking about.

21              MS. STRATTON:  Yes, sir.

22              MR. OTTOWAY:  Well, your Honor, the alternative

23   process is I believe we filed an advisory requesting Plaintiffs

24   to file an alternative proposal for purposes of meeting the full

10:02:25  25   pleading requirements of Baze and Glossip.  And at the point --

1          THE COURT:  You were on Law Review, weren't you?

2          MR. OTTOWAY:  I was not, your Honor.

3          THE COURT:  Really?  Well, you must be struggling to

4   overcome --

10:02:38   5          MR. OTTOWAY:  I'm primarily an appellate attorney,

6   your Honor.

7          THE COURT:  All right.  Tell me the rule and don't

8   tell me the name of the guy or the Court where it happened.  I

9   just need for you to tell me what you want is for the Plaintiffs

10:02:56   10   to plead what?

11          MR. OTTOWAY:  Actually, I don't need the Plaintiff to

12   plead anything.  I think they finished their pleadings when they

13   responded to your order requiring them to provide a proposed

14   alternative.  Because that finalized their pleading, I think

10:03:14   15   that was a functional amendment; and I would like the ability to

16   file a dispositive pleading in response to the entirety of their

17   complaint with the amendment.  So, that would dispose of any --

18          THE COURT:  Well, you can file any dispositive motion

19   you want, I guess.  But apparently, there's some thought that a

10:03:38   20   recent Supreme Court case has created a new opening.  I read it

21   and don't think it affects this.  But --

22          MR. OTTOWAY:  I agree with you, your Honor.

23          THE COURT:  -- I don't see any harm in letting

24   Whitaker restate his view of an alternative approach.  At least

10:04:11   25   legally, the facts should be about the same, shouldn't they?

1          MS. STRATTON:  Yes, your Honor.

2          MR. OTTOWAY:  And I'm unopposed to an amended

3   complaint -- a second amended, I believe.

4          THE COURT:  Third or fourth.

10:04:22   5          MR. OTTOWAY:  And if they finalize it, then it would

6   provide me an opportunity to see whether this would be

7   appropriate for a motion to dismiss and there would be no issues

8   with respect to discovery if, indeed, granted by the Court.  I

9   think with the additional time that we have, that might be a

10:04:42   10   more appropriate procedural step, your Honor.

11          THE COURT:  Well, since I don't know what Williams is

12   going to say about that recent Supreme Court decision, I can't

13   decide whether it makes any sense to let him do it.  That's one

14   of the troubles with -- you know, and ordinarily, I'm not crazy

10:05:08   15   about multiple amended complaints.  That's kind of

16   old-fashioned.  I think you ought to put everything in the first

17   one.

18          But in today's practice in no field of law,

19   they're particularly informative and the answers are equally

10:05:29   20   bad.  List of affirmative defenses and lots of stomping of feet

21   saying, "No, we didn't" but not a fact.

22          All right.  Is there anything the State needs

23   given the current state of the pleadings?

24          MR. OTTOWAY:  Well, if you permit them to amend again,

10:06:01   25   the opportunity to file a dispositive motion.  And then, we

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  would ask with respect to the date of the compounding for the

2  executions that have used, we'd ask that be stayed until we're

3  allowed to file a motion to dismiss or summary judgment.

4          THE COURT:  It's a little late for a motion to

10:06:23  5  dismiss, isn't it?

6          MR. OTTOWAY:  Your Honor, I'm going to cite 12(b)(6),

7  but I don't believe it is because their complaint was not

8  complete until you permitted them to file the alternative

9  theory.

10:06:39  10         THE COURT:  Well, why didn't the State mention that a

11  long time ago?  I'm not unraveling this.  We have a real

12  problem; and despite the nature of this kind of litigation, it

13  is important to the Court, to the rule of law, to the public

14  perception of the State of Texas and this process, and the

10:07:18  15  claimants that we address the real issues and know what's going

16  on.

17                  Everybody in the room understands that there's

18  some humanity and a lot of politics.  As somebody who in his

19  youth tried political cases and as a judge who knows there's an

10:07:55  20  important way to accomplish things -- a lot of them are just

21  press releases with no substance, like somebody who lost an

22  election saying that his 1st Amendment rights were violated

23  because he wasn't elected.  As somebody who's lost elections, I

24  may have felt that way; but I wasn't stupid enough to put it in

10:08:14  25  print.

1                    All right.  Before I get to the rest of mine,

2      Ms. Stratton, when would it be reasonable for Whitaker and

3      Williams definitively to amend the petition, remembering that

4      the rule says a short plain statement of the facts, not

10:08:51   5      additional briefing?  Briefing can be done by them, but I need

6      to have in one document a succinct statement of the claims and

7      the facts upon which they rest.

8                    MS. STRATTON:  We can have it on file next week, your

9      Honor.

10:09:04   10                   THE COURT:  When?

11                   MS. STRATTON:  Next week.

12                   THE COURT:  Next week.

13                        Now, Ms. Levin, are you going to write it?

14                   MS. LEVIN:  I don't know, your Honor.

10:09:17   15                   THE COURT:  Well, who is --

16                   MS. LEVIN:  One of --

17                   MS. STRATTON:  It's a team effort.  This entire case

18     is a team effort, your Honor.

19                   THE COURT:  Well, it --

10:09:26   20                   MS. STRATTON:  There's not going to be one person who

21     takes pinch paper.

22                   THE COURT:  Well, it needs to be a lot better than

23     what I've seen, which sounds like the certificate of service has

24     been by Ms. Levin which should suggest some responsibility for

10:09:51   25     the missive to which her certificate is attached.


                   Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1              I don't think she's working as a third-level
 2   associate just sending the things out.  It needs to be clear.
 3   Cutting and pasting is a fine thing as long as it makes sense
 4   and as long as we don't switch Defendant and Petitioner and all
 5   kinds of things.  I've read it all.
 6              How many of these kinds of cases have you joined?
 7        MS. LEVIN:  I'm sorry, which kinds of cases?
 8        THE COURT:  Death penalty kinds of cases.
 9        MS. LEVIN:  Scores.  I couldn't give you a specific
10   number.  I've been litigating death penalty cases for over 20
11   years.
12        THE COURT:  Why isn't your paperwork better?
13        MS. LEVIN:  I don't have an answer for that, your
14   Honor.  I do my best.
15        THE COURT:  How many of the people whom you have
16   represented have you ever met?
17        MS. LEVIN:  Every single one of them.
18        THE COURT:  When did you meet Whitaker and Williams?
19        MS. LEVIN:  We're meeting them next week.
20        THE COURT:  "Have met" and "gonna meet them" is
21   categorically different.  That's the problem.  You think "I'm
22   gonna to do something" you get credit for having done it.  How
23   long has this case been on file?
24        MS. LEVIN:  Your Honor, we've been in touch with the
25   named Plaintiffs in this case through their appointed counsel
```

Time stamps: 10:10:17 (line 5), 10:10:42 (line 10), 10:11:01 (line 15), 10:11:15 (line 20), 10:11:30 (line 25)

 1  when they had counsel.  It is not --

 2          THE COURT:  My understanding is that's not exactly

 3  what's been going on.  Who was the -- ma'am, this case was filed

 4  October 1, 2013; and next week you're going to meet your

10:12:13  5  clients.  Who was the lawyer with whom you were coordinating?

 6          MS. LEVIN:  With Mr. Whitaker's case, he is

 7  represented by James Rytting, and I have been in touch with him

 8  since we filed this lawsuit and discussed it with him and

 9  obtained his permission which he obtained from his client.

10:12:36  10          THE COURT:  Have you seen something where Mr. Whitaker

11  signed permission?

12          MS. LEVIN:  I believe I have e-mail --

13          THE COURT:  I don't want a belief, ma'am.  "Yes" or

14  "no"?

10:12:47  15          MS. LEVIN:  I can't answer 100 percent.  I had e-mail

16  correspondence with Mr. Rytting at the beginning of this

17  lawsuit.

18          THE COURT:  Ma'am, I don't want a stream of conscious

19  narrative.  Did you read the transcript from my harangue of poor

10:13:09  20  Ms. Stratton a couple of weeks ago?

21          MS. LEVIN:  Yes, your Honor.

22          THE COURT:  My guess is that was all properly

23  addressed to you, as I hope I carefully explained to her.  This

24  is not a game.  You're consuming resources, and your client

10:13:33  25  deserves better than being somebody third hand.  Did you

1  represent the people in that Atlanta case that -- where I got

2  all the data from that Atlanta case for Mr. Yowell?

3          MS. LEVIN:  I don't know what case you're referring

4  to.

10:13:56  5          THE COURT:  Mr. Yowell's pleadings and expert things

6  were all taken from an Atlanta case, as I recall.

7          MS. LEVIN:  I don't know.  I've never represented

8  anybody in Georgia.

9          THE COURT:  Where did you get the expert -- why did

10:14:15  10  you get all that stuff then if that wasn't your expert?

11          MS. LEVIN:  Because we had an incredibly short time

12  frame to provide the Court with what you requested; and we did

13  the best we could, which was to borrow from other lawyers

14  litigating similar cases.

10:14:38  15          THE COURT:  You've been doing this for 20 years all

16  over the country, you say, except Georgia.

17          MS. LEVIN:  No.  I've been --

18          THE COURT:  I don't blame you for that.

19          MS. LEVIN:  I've been doing it for 20 years in Texas,

10:14:50  20  your Honor.

21          THE COURT:  Only in Texas?

22          MS. LEVIN:  Some in Virginia, a trial case in

23  Colorado.  Almost -- about 95 percent in Texas.

24          THE COURT:  Okay.  If you do it in Texas, Colorado,

10:15:05  25  and Virginia, that pretty much covers the country.  Nobody wants

 1  to have anything to do with the Atlantic Northeast or West

 2  Coast.  They snub us; we ought to snub them back.

 3          MS. LEVIN:  Your Honor, may I be heard on one thing?

 4          THE COURT:  Yes, ma'am.

10:15:37  5          MS. LEVIN:  When I represent clients in habeas corpus

 6  proceedings, I meet them, I take my job incredibly seriously and

 7  my commitment to clients incredibly seriously.

 8          THE COURT:  Okay.

 9          MS. LEVIN:  In actions like this where the Plaintiffs

10:15:56 10  were already represented in their habeas proceedings at the time

11  we filed the lawsuit, the appropriate thing to me was to go

12  through their existing lawyers; and that is the reason we have

13  not met them to date.  I have been keeping their counsel

14  apprised up until the time Mr. Williams had no lawyer.

10:16:22 15          THE COURT:  Is that what Mr. Williams said in the

16  hearing last week or earlier this week?

17          MS. LEVIN:  He was talking about his habeas corpus

18  lawyer.

19          THE COURT:  Who is the person you're relying on.

10:16:39 20          MS. LEVIN:  He is the person that I communicated with

21  when we initiated this lawsuit.

22          THE COURT:  And what did Mr. Williams say about his

23  habeas corpus lawyer?

24          MS. LEVIN:  He has not had a lawyer.  His lawyer's

10:16:53 25  name was Mr. Williams, as well, so it's confusing; but he has

 1   not had a lawyer --

 2              THE COURT:  Or simplifies it.

 3              MS. LEVIN:  -- since February of this year.

 4              THE COURT:  So, in the last seven months, with whom

 5   have you been talking?

 6              MS. LEVIN:  I have not communicated with Mr. Perry

 7   Williams during that time.  I -- let me take that back.  I wrote

 8   Mr. Williams approximately two to three weeks ago to advise him

 9   of the trial date and to let him know that we would be coming to

10   see him to discuss further.

11              THE COURT:  So, you've been staying in touch, except

12   for the last eight months, through a lawyer who I don't know

13   what happened to him but has not been representing him.  You

14   can't remember whether you have a power of attorney from him.

15   These men are not pawns for you to play with.

16              MS. LEVIN:  That is the farthest thing and the

17   farthest manner in which I think of them.

18              THE COURT:  Ma'am, your emotions do not matter.  What

19   matters are the facts and the law.  It's not about you, it's not

20   about your cause.  You can have all the causes you want.  But

21   when you file a suit, it has to be done right on time.

22                   Mr. Williams and Mr. Whitaker deserve a fair

23   hearing, but they can't get one if it's going to be from stuff

24   you copied from an Atlanta case, or a Georgia case, and just

25   threw in there that raised an issue that appears to have no

10:17:06   (line 5)
10:17:28   (line 10)
10:18:02   (line 15)
10:18:26   (line 20)
10:18:58   (line 25)

1  substance, even according to Dr. Ruble, that is, they used a

2  compounding pharmacy.

3            The question is the quality of the drug.  Do it

4  and do it on time and do it right.  Is that clear?

10:19:27   5            MS. LEVIN:  Yes.

6            THE COURT:  Mr. Whitaker and Mr. Williams have been

7  well represented by local counsel.

8            And I assume you're doing it pro bono?

9            Not you.

10:19:43   10            MS. STRATTON:  Me?  Oh, yes, we're all doing it pro

11  bono, your Honor, including Ms. Levin.

12            THE COURT:  How do you live if you do pro bono cases

13  full time?

14            MS. LEVIN:  I don't do pro bono cases full time.

10:20:02   15            THE COURT:  What do you do when you're not doing pro

16  bono cases?

17            MS. LEVIN:  I have a variety of contract work by which

18  I get paid to do death penalty cases.

19            THE COURT:  Say that -- you do contract work?

10:20:18   20            MS. LEVIN:  Yes, your Honor.

21            THE COURT:  On death penalty cases where you get paid?

22            MS. LEVIN:  Yes, your Honor.  Sometimes I do CJA

23  cases.

24            THE COURT:  In Texas or --

10:20:34   25            MS. LEVIN:  Yes.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  All right.  I would like briefly to

2   discuss Dr. Ruble.

3          MS. STRATTON:  Yes, sir.

4          THE COURT:  Pardon?

10:21:08   5          MS. STRATTON:  I said yes, sir.

6          THE COURT:  I, as I recall, put two questions to him:

7   The pharmacological deterioration data and that sort of thing,

8   the science on that in the abstract, and the direct medical

9   consequences with their timing and all that sort of thing.

10:21:38  10          I got a rather curious scientific report which at

11   least three and maybe four times quibbled or squabbled about the

12   Court's rulings saying he didn't have the data on -- and then,

13   he listed all the stuff about the specific facts in this case.

14          There is a body of scientific learning in

10:22:09  15   pharmacology, physiology, physical medicine that I want the

16   Petitioners to display.  He didn't do that.  First, somewhere in

17   there, he says he's not a doctor so he can't talk about that;

18   and the last page is nothing but a medical analysis, a bad

19   medical analysis.  So, he starts out saying he can't do it and

10:22:39  20   ends up doing it anyway.

21          When I tell him to do something, I am not

22   interested in what he thinks I should tell him to do.  You-all

23   are free to ask him any question you want and get him to write

24   about it.  What I wanted then and I still want now is the

10:23:02  25   pharmacology on pentobarbital liquified for injection.

1               There has to be more.  He also must have been an

2    appellate lawyer once like Mr. --

3               MS. STRATTON:  He is a lawyer, your Honor.

4               THE COURT:  Oh, he is that, too?

10:23:33  5     MS. STRATTON:  He has a JD.

6               THE COURT:  Well, that explains it.

7               MS. STRATTON:  He was a patent attorney.

8               THE COURT:  Oh.

9               MS. STRATTON:  So, we take them as we get them, but

10:23:39  10   that's --

11              THE COURT:  He's a recovering patent attorney.

12              MS. STRATTON:  Yes.

13              THE COURT:  All right.  Because the quality of his

14   report is not determined by the number of sections he can quote,

10:23:58  15   and it started with him -- none of which answers the question.

16   And then, for the doctor, I need to know the physical

17   consequences to a human body when it has been injected with

18   pentobarbital liquified that meets any of the descriptions of

19   what happens to it as it's kept.

10:24:29  20             For instance, the granulation -- I don't think

21   that's the right term.  The things Ruble says cause pulmonary

22   hematoma and pulmonary embolisms or something?

23              MS. STRATTON:  Yes.

24              THE COURT:  Not in 30 minutes would be my medical

10:24:55  25   guess; and since he's guessing, I'm going to guess, too.  I need

1  the data that it will have particles of this size or that size

2  and then a doctor to say if they're Size A, these are the

3  consequences within two or three hours.  If they're this size,

4  these are the consequences.  If they're this size, those are the

10:25:27  5  consequences.  And here is, again, the medical consequence of

6  the primary consequence.  And we'll just use pulmonary

7  embolisms.

8          I can speak it but I can't spell it.  That if the

9  granule gets to his lungs of whatever size and not all of them

10:26:00  10  will have an immediate adverse effect.  So, the likelihood of

11  there being a lesion or a blockage in the lungs within a couple

12  of hours or -- that may be too long.

13          But we're talking 45 minutes maximum, aren't we?

14          MR. OTTOWAY:  I believe the longest has been 30.

10:26:26  15          THE COURT:  I think it's something like that.  But I'd

16  like to go beyond that so that we know the margin of safety or

17  whatever you call it under these circumstances, efficacy.  I

18  need a physician to do that; and I need a non-argumentative,

19  non-petulant person to answer my question.  That's all --

10:26:58  20          MS. STRATTON:  I will tell you, your Honor, Dr. Ruble

21  and I had many conversations about how to answer the Court's

22  questions as you phrased them in the case management order.  His

23  struggle was twofold:  one, which was what I was concerned that

24  it would be when we were last before you, is that the testing --

10:27:25  25  there isn't industry testing done on compounded pentobarbital

1  that will answer your question.  And so, he's doing a lot of

2  surmising based on testing that's done on manufactured

3  pentobarbital as well as his understanding of the compounding

4  process.

10:27:44  5          THE COURT:  I'm sorry.  But it's part of this job.  I

6  can interrupt.

7          MS. STRATTON:  No, that's okay.

8          THE COURT:  Does manufactured pentobarbital, when

9  liquified, have the same mechanical and chemical properties?

10:28:04  10          MS. STRATTON:  Dr. Ruble's opinion is it is not the

11  same drug.

12          THE COURT:  I don't -- I'm not -- he pretty much

13  self-eroded his credibility.  I need somebody who will again

14  quit raising that.  If he can't find standards on it, then say,

10:28:30  15  "You need to find somebody who can find the standards."  But I

16  don't know and he doesn't know -- or certainly, he didn't tell

17  me what a difference was that was material to this inquiry

18  between those two kinds of pentobarbital and how it would affect

19  Mr. Whitaker and Mr. Williams.  He keeps going back to he

10:28:59  20  doesn't want me to allow him to do it.

21                   Are the --

22          MS. STRATTON:  I think the issue is probably me, your

23  Honor, in translating what you're asking to his question.  I

24  know that we spent a lot of time trying to make sure that what

10:29:24  25  he was including in his report was answering your question.  And

1   so, I'm sure that if it is not, then it is -- it is on me that

2   I'm not translating it correctly because --

3              THE COURT:  I'm confident it's not you.

4              MS. STRATTON:  -- Dr. Ruble is -- no, no, no.  I'm

10:29:41  5   confident it is me, your Honor; and the reason that I say that

6   is because Dr. Ruble is an insanely smart man.

7              He's also an insanely humble man, and he will --

8   he would be very embarrassed by the fact that I was standing

9   here saying that about him, but he -- he will most certainly

10:29:59  10  answer any question that you have and -- but his struggle with

11  the question you had in the case management order is that it's

12  -- it's not -- it's not directly answerable scientifically.

13             And it's not that he can't answer it, it's that

14  he doesn't believe it is answerable and in part is because of

10:30:22  15  the degradation isn't linear.

16             THE COURT:  It normally isn't.  It certainly wasn't in

17  my case.  I seem to be picking up the pace of degradation

18  geometrically.

19             MS. STRATTON:  But your question was fairly linear;

10:30:40  20  and so, he was -- he was challenged at how to answer your

21  question directly because --

22             THE COURT:  Well, there's going to be a line; but

23  where the curve on the line is, it can go like this and then --

24  I guess degradation goes the other way.  Yes, there's going to

10:30:56  25  be two axes on which you can plot the data.

1          MS. STRATTON:  I believe that is what he tried to do;

2     but if he -- but if he didn't, then it's more on me than it is

3     on him.  I truly believe that if he was sitting there in the box

4     and you were answering (sic) him questions, he would be able to

10:31:12   5     answer your questions.

6          THE COURT:  But the way it works is --

7          MS. STRATTON:  I understand.

8          THE COURT:  -- we make him articulate it and support

9     it in writing so that everybody can look at it beforehand.

10:31:28  10          MS. STRATTON:  Understood.

11          THE COURT:  Because technical reports need study.

12     It's not exactly reading the officer's report of an accident.

13          MS. STRATTON:  I agree.  Understood.

14          THE COURT:  And I tend to like physics and chemistry

10:31:49  15     better than economics, although I know a lot more about

16     economics.  They just write differently.  I am content that you

17     should ask him, if you choose, to write the question he thinks I

18     should ask.  What is the scientific question in the abstract?

19     Not how fast did the delivery boy go with any particular load;

10:32:40  20     but given the range of things that can happen, what is the data

21     on that?

22          And if he can only do it for manufactured, then

23     -- and since he both says he is a physician and isn't in the

24     report, does he want to draft -- if he would like, he may draft

10:33:07  25     the medical question.

1          MS. STRATTON:  So, on the medical issue, Dr. Ruble has

2  some clinical experience in injectables.

3          THE COURT:  So do I.

4          MS. STRATTON:  Not from the receiving standpoint, from

10:33:31  5  -- I'm trying to find a way to be funny, but I'm not a funny

6  person.  So, he -- and so, that's why he felt he could answer

7  the second question in a limited fashion.  We have, however --

8          THE COURT:  After saying he couldn't and he didn't

9  answer it.

10:33:46  10          MS. STRATTON:  You're correct, he didn't.  He said,

11  "This is what I think is a possibility."  But he had no clinical

12  experience to back it up.

13          THE COURT:  And guessing with the standard of

14  possibility is not acceptable and it was a press release about

10:33:58  15  how horrible it could be.

16          MS. STRATTON:  I don't disagree.  But at the last --

17  the 26th, whatever date that was -- days are bleeding together

18  in my mind these days -- we had started a very -- when we saw

19  your question come out in the case management order, we knew

10:34:16  20  Dr. Ruble could not answer that question.

21              It's not his experience.  He's not a medical

22  doctor.  And so, we began the process to find someone who could

23  answer that question, and we have.  Had we still been set for

24  trial next week, we would have filed a report yesterday from

10:34:33  25  that doctor.  Her name is Nancy Glass.  She's from Houston.  She

 1    is an anesthesiologist.  She works at Baylor and Texas

 2    Children's Hospital.  She had -- can answer that question.

 3              THE COURT:  An anesthesiologist?

 4              MS. STRATTON:  An anesthesiologist, yes.  And she can

10:34:50  5    answer that question.

 6              THE COURT:  I don't care if they're from Canada or --

 7              MS. STRATTON:  Well, we wanted someone local.  I mean,

 8    partly, we're doing this pro bono, so my firm is paying them.

 9    And so, you know, that's what you do when you take a pro bono

10:35:05 10    case; and so, if I can find someone from Texas that's from

11    Houston, then, you know, that's what I wanted to do.

12                    And so, we found someone local.  She had started

13    a report.  I gave her a reprieve --

14              THE COURT:  Good.

10:35:17 15              MS. STRATTON:  -- since you gave us a reprieve.  But

16    she will finish that report, and she will be able to thoroughly

17    answer your question number two.

18              THE COURT:  All right.  Does she need the first

19    question data?  Because my thought was you get the chemical

10:35:37 20    processes described accurately and then the physician responds

21    to that because this may not be something that's common enough.

22    It may be that there are enough other drugs that have the same

23    problems that she may know.

24              MS. STRATTON:  Correct.  And she does.

10:35:54 25              THE COURT:  So, at the moment, we may have enough

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    time.  So, ask her if she would like to wait until I get an

2    acceptable answer to the first question.

3             MS. STRATTON:  I'm sure as a lawyer I would like her

4    to be able to wait until the answer to the first question.

10:36:14  5             THE COURT:  Yes.

6             MS. STRATTON:  I mean -- but she does have enough

7    experience with injectables, obviously, as an anesthesiologist

8    that -- and she's not a newly licensed physician either.  She's

9    been licensed for more than 20 years and has a lot of experience

10:36:33  10    and has experience in, what's the word, the de-liquifying of the

11    injectable.

12             I know they have a medical term for that, and my

13    brain is escaping me as to what it's called.  But when it's --

14    the chunks start to show up in the vial.  You know, she has

10:36:52  15    experience with that.

16             THE COURT:  It curdles.  When it curdles.

17             MR. OTTOWAY:  Precipitates.

18             MS. STRATTON:  Precipitates, thank you.  The legal

19    term -- or the medical term.

10:37:05  20             THE COURT:  It may not be precipitation.  It may be a

21    chemical reaction between --

22             MS. STRATTON:  But for the precipitation into water --

23             THE COURT:  Yes.

24             MS. STRATTON:  -- it, you know -- I mean --

10:37:09  25             THE COURT:  But it may be a reaction between two

1  components after certain forms of some third kinds of stuff.

2        MS. STRATTON:  Right.  Basically, where the powder is

3  no longer liquified.  When that begins to happen, she has

4  experience with that; and regardless of Dr. Ruble's --

10:37:25  5        THE COURT:  Has to be a common problem.

6        MS. STRATTON:  What's that?

7        THE COURT:  It has to be a common problem that things

8  don't stay the way they were and they either deteriorate or

9  react.  All --

10:37:36  10        MS. STRATTON:  I don't know if she would call it

11  common, but she would definitely call it a problem.  I don't --

12  it's something she's experienced.  I don't know how common it

13  is.  I didn't ask her.

14        THE COURT:  I don't know that it wouldn't happen with

10:37:49  15  Tetanus if you left it laying around.

16        MS. STRATTON:  It probably would, I would imagine.

17              And so, she has read both of Dr. Ruble's previous

18  reports.  She informed me that she found them helpful and

19  informative and in line with her opinion about, you know, the

10:38:05  20  injectables; and -- but if -- I would prefer, because she's in

21  part basing some of her opinion off of Dr. Ruble's opinion, that

22  she be able to --

23        THE COURT:  But you need to tell her --

24        MS. STRATTON:  If he's going to revise a report, then

10:38:20  25  she'd like -- I'd like for her to be able to provide her report

1  after that.

2          THE COURT:  First, I want a question because at the

3  moment I don't want another report from him.

4          MS. STRATTON:  Okay.

10:38:29  5          THE COURT:  But since you asked --

6          MS. STRATTON:  Oh, you want a question.

7          THE COURT:  I want --

8          MS. STRATTON:  You want to know what would be the --

9  in his world, what would the question be that you --

10:38:36  10          THE COURT:  And after he writes it, before you send it

11  to me, you might run it by her to see if she thinks it's the

12  right question.  But I don't want her to sit here and testify

13  that, Well, based on Ruble, I opine this.  I have no confidence

14  in him.

10:38:58  15          MS. STRATTON:  Well, I hope to rehabilitate you for

16  him, your Honor, because --

17          THE COURT:  No, him for me, not me for him.  I'm

18  unrehabilitative (phonetic spelling).

19          MS. STRATTON:  I got my pronouns backwards.  I hope to

10:39:09  20  rehabilitate him for you because he is -- he is an amazing

21  educator, I'll just put it that way.  I've become very educated

22  about compounded drugs because of what he shared and what he has

23  provided, and I am confident that he will be able to very --

24          THE COURT:  That's why I'm giving you one more

10:39:34  25  chance --

1          MS. STRATTON:  Okay.

2          THE COURT:  -- to see if he can do it.

3          MS. STRATTON:  Okay.  I think the issue may be that

4    we're trying to do this -- I understand what the rule requires

10:39:42    5    on written paper, but Dr. Ruble's much more eloquent in a

6    conversation.

7          THE COURT:  Perhaps.  But you know, there's this law

8    and order compound.

9          MS. STRATTON:  Yes.

10:40:04   10          THE COURT:  The order turns out to be fairly

11    important.

12          MS. STRATTON:  Agreed.

13          THE COURT:  And you know, I can't have somebody

14    testify who is likely to volunteer information.

10:40:19   15          MS. STRATTON:  I'm sorry, I don't understand.

16          THE COURT:  Well, it happens with all kinds of

17    witnesses where they're asked one question but they answer it by

18    -- by saying --

19          MS. STRATTON:  Oh, sure.

10:40:30   20          THE COURT:  -- something about somebody in Kansas City

21    dying three times.  You know, like the guy in Atlanta testifying

22    that compounded drugs are unusable because a bunch of old people

23    died in Massachusetts of meningitis.

24          MS. STRATTON:  Dr. Ruble most certainly -- he's not an

10:40:52   25    experienced testifier.  I mean, he's -- to my understanding,

1   he's only testified once previous.  His life as an attorney was

2   fairly short-lived; and as we know, when you're dealing -- well,

3   as my experience with patent lawyers, you don't necessarily prep

4   witnesses very often.

10:41:08   5             So, he doesn't have a lot of experience in being

6   a witness or prepping a witness or helping to relay -- answer

7   the question asked while on the stand.  That's most certainly --

8   you know, he's a layman where that's concerned, but he's an

9   incredibly smart pharmacist.

10:41:26   10         THE COURT:  As I have said in print that lawyers are

11   among the smartest best lawyers I see, but they invented

12   over-litigation.  There's just not a fact in existence about

13   whatever it is that I don't need to know and life is a little

14   more practical than that.

10:41:49   15             All right.  Let's take a 15-minute recess.

16         (Court recessed at 10:43 a.m.)

17         (Court resumed at 11:07 a.m.)

18             THE COURT:  She's looking for her Valium.

19             MS. STRATTON:  I was looking for a highlighter

11:08:23   20   actually.

21             THE COURT:  Here.

22             MS. STRATTON:  Oh, thank you.

23             THE COURT:  I think what Ruble is trying to say is if

24   you build a house out of oak and you build one out of pine, they

11:08:59   25   both meet the building codes.  One of them is not as strong as

1   the other; and it may have consequences, early rot in the pine,

2   maybe less tensile strength.  Don't write this data about oak

3   and pine.

4          MS. STRATTON:  I have to write notes so that I

11:09:28   5   remember references --

6          THE COURT:  Okay.

7          MS. STRATTON:  -- because I have a horrible memory.

8          THE COURT:  I'm guessing about tensile strength and

9   things like that.  And he's saying that, if you have this

11:09:44   10   compounded stuff, it's like the pine house and is liable to

11   deteriorate faster.  That's not a -- that's a good analogy but

12   it's not perfect, obviously.

13          I need to know that there would be four or five

14   standards by which you could judge whether in this case the

11:10:20   15   house only has to last six months so it probably would be

16   irrelevant but if you were planning on something that needed to

17   be there 40 years later, it might make a difference.

18          And please, he should not use that analogy

19   because it may not be even close enough.  But he has to tell me

11:10:49   20   how he knows compounded is pine and manufactured is oak.  But

21   mainly, I need to know from either or both of them what the

22   specifics are that would make somebody decide to choose one over

23   the other.

24          How many autopsies were done on the 26 prisoners

11:11:21   25   who were executed?

```
        1              MR. OTTOWAY:  I apologize, your Honor.  I could find
        2   that out for you, but it is my understanding that there are no
        3   autopsies done on those individuals.  But again, I could follow
        4   up.
11:11:32 5              THE COURT:  All right.  Double-check.
        6                   If there are autopsies, do you want them?
        7              MS. STRATTON:  If there are, yes, of course, I would
        8   want them.
        9              THE COURT:  Why didn't you ask for them?
11:11:42 10             MS. STRATTON:  Because Ms. Levin does not believe that
       11   they are done.
       12             THE COURT:  I know.  But belief is not nearly as good
       13   as actual data.
       14             MS. STRATTON:  She may actually know.  She wants to
11:11:52 15  say something.
       16             MS. LEVIN:  I've seen it in a legal document that TDCJ
       17   has stated that they do not perform autopsies.
       18             THE COURT:  Okay.
       19             MR. OTTOWAY:  I can say that the policy releases the
11:12:05 20  body to a funeral home as opposed to a coroner.  And so, I don't
       21   believe that's --
       22             THE COURT:  Just make sure.  And get somebody to put
       23   their left thumb print on it so we can make sure that what that
       24   lawyer for the State said was true.
11:12:18 25             MR. OTTOWAY:  I will send an e-mail to opposing
```

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    counsel when I find out.

2            THE COURT:  Well, find out but get somebody who is an

3    operating person to write a simple declarative sentence and say,

4    "Of the 26 pentobarbital executions, none was autopsied" or

11:12:44   5    seven were.  If seven were, get Ms. Stratton seven autopsies

6    along with the age of the pentobarbital on those occasions.

7            All right.  There is no need to rush, but we need

8    to get this done and get it done in the next 60 days or so.  If

9    the State of Texas thinks it might be fixing to set a date, you

11:13:38   10   should tell the Court and counsel.

11           MR. OTTOWAY:  Yes, your Honor.

12           THE COURT:  We don't need to know the date, we just

13   need to know that it's back in the pipeline or something.  So, I

14   may want to adjust the schedule based on some sort of likely

11:13:56   15   imminence.

16           When -- oh, you're going to amend next week?

17           MS. STRATTON:  Yes.  If we could have until Friday.

18   We're currently planning to go see Mr. Whitaker and Mr. Williams

19   on Thursday.  So, that will give us time.

11:14:40   20           THE COURT:  All right.  The 11th?

21           MS. STRATTON:  Yes.

22           THE COURT:  Now, you have only four days next week.

23           MS. STRATTON:  Understood.  We were very close to

24   having it done yesterday, so we don't need a lot more time.

11:14:52   25           THE COURT:  Well, go back and edit it.

1          MS. STRATTON:  We will, your Honor, I promise,

2     particularly the style of the case.

3          MR. OTTOWAY:  Your Honor --

4          THE COURT:  Yes, sir.

11:15:13  5          MR. OTTOWAY:  -- do you have a deadline that you would

6     like to impose on the State with respect to a motion to respond

7     to their amended petition?

8          THE COURT:  No.  I want to suggest a deadline on the

9     autopsy data, the age of the pentobarbital data and when you get

11:15:35  10    me the master --

11               Formulation record?

12          MS. STRATTON:  That's what it's called, yes.

13          THE COURT:  -- and the certificate of analysis, too --

14     I wrote the words without --

11:15:51  15          MS. STRATTON:  That's correct, also.

16          THE COURT:  Get those to me.

17          MR. OTTOWAY:  To you for in camera review?

18          THE COURT:  Yes.  I'll look at them, and I may

19     reluctantly appoint a Court-appointed technician under whatever

11:16:10  20    that rule is.  I've only done it once in 36 years, whatever it's

21     been.  But it should be a narrow inquiry so that I just better

22     understand this.

23          MR. OTTOWAY:  And so -- I'm sorry.  If I could make

24     sure I have everything that you're looking for.

11:16:35  25          THE COURT:  You're going to get an order.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. OTTOWAY:  Okay.

2          MS. STRATTON:  And then, just -- I mean, just to be

3    clear, your Honor, I mean, upon reviewing those, if -- I just

4    want to make sure that it's understood that if the pharmacy is

11:16:51    5    really legitimately concerned about, you know, trade secrets and

6    proprietary information, everyone on our side of the case,

7    including our experts, is willing to enter into a protective

8    order.  We're not opposed to that; and frankly, I think I've

9    suggested it to them, so --

11:17:08    10          THE COURT:  I know no way -- and this is not a

11    reflection on you-all, but I know no way to enforce that.

12          MR. OTTOWAY:  And I have to say, your Honor, that is

13    the concern of the State with respect to providing that

14    information at this time.

11:17:22    15          THE COURT:  I understand that.  That's why I'm going

16    to the trouble of looking.

17          MS. STRATTON:  I just want to be clear.

18          THE COURT:  If it were not this type of case, I would

19    let Ms. Stratton see anything on her word that she wouldn't use

11:17:36    20    it otherwise.

21              And I'm not suggesting you would in this case.

22          MS. STRATTON:  No.  Understood.  I understood the

23    point and I --

24          THE COURT:  There are too many people with too much

11:17:48    25    access to documents that I order people to produce.

1           MS. STRATTON:  Understood.  And I was also saying that

2    with the caveat assuming that anything pertaining to the

3    pharmacy or the chain of purchase would even be redacted, you

4    know.

11:18:09   5           THE COURT:  You can give me the unredacted version so

6    I can make sure you only redacted the data that should be

7    redacted.  So, give me both.  But I'm interested in the

8    scientific data.

9           MR. OTTOWAY:  Well, your Honor, I have to make some

11:18:29  10   objections to that.

11          THE COURT:  Okay.

12          MR. OTTOWAY:  And so --

13          THE COURT:  You want me to overrule them now or after

14   you make them?

11:18:34  15          MR. OTTOWAY:  I'd like to make them.

16          THE COURT:  Okay.

17          MR. OTTOWAY:  I believe that they should file their

18   amended petition -- or I'm sorry, their complaint and we should

19   be allowed to file a 12(b)(6) motion.

11:18:44  20          THE COURT:  I know you do, and I've already ruled on

21   that.  How many times do you want me to rule on that?

22          MR. OTTOWAY:  I need to preserve the record, your

23   Honor.

24          THE COURT:  Every time you raise it doesn't create a

11:18:53  25   new record need.

1          MR. OTTOWAY:  With respect to the discovery, your

2     Honor, and I apologize.

3          THE COURT:  It applies to everything in the case,

4     counsel.

11:18:59   5          MR. OTTOWAY:  Okay.  Thank you, your Honor.

6          THE COURT:  You objected once.  You stated the

7     problem, and I overruled it.

8          MR. OTTOWAY:  All right.

9          THE COURT:  And that overruling is good for the entire

11:19:09  10     hearing today.

11          MR. OTTOWAY:  Thank you, your Honor.

12          THE COURT:  And if you would like it to be more

13     official, I'll do it in Mr. Clendenin's blood.  He should

14     contribute to this.

11:19:37  15          All right.  As we now stand, Ms. Stratton,

16     Williams and Whitaker do not have a pharmacological technician.

17     It will have to be new from the -- I think I have two reports?

18          MS. STRATTON:  You have two reports from Dr. Ruble.

19          THE COURT:  They don't pass the test for reliable

11:20:11  20     scientific testimony because they argue about data that are not

21     relevant.  The only question he agreed with the pharmacologist

22     that the State had about post-liquefaction testing, it

23     eliminates concerns about pre-liquefaction quality.

24          MS. STRATTON:  I don't know what to do with that, your

11:20:59  25     Honor.  I mean, you have asked some very specific questions of

1   us to answer, and we've tried to answer those very specific

2   questions.  I guess I'm at a loss to understand what it is I can

3   do differently in order to overcome this burden you're putting

4   on us.

11:21:23   5       THE COURT:  I'm not, the law does.  I'm not having

6   Ruble testify from a report which is 60 percent extraneous and

7   inconclusive and unsupported for the rest.  I've read both

8   reports at least twice.  I need the data that I asked for and

9   expertly.  So, we're going to start question and we're going to

11:22:00   10  let him answer my question by giving me the question to see if

11  he's got the question right.  And then, you'll -- when we get

12  the answer to that, if that meets the test, we'll let the doctor

13  rely on it to form her opinion.

14       MS. STRATTON:  Okay.  I -- okay.  I'm standing here

11:22:21   15  perplexed because I hear what you're saying.  I'm concerned

16  though, with all due respect, that the issue is that it's not --

17  it's not black and white because of the nature of compounding

18  drugs.  And I -- I don't want the issue to be me because I'm not

19  relaying it correctly.

11:22:52   20      THE COURT:  No.  But there is a line in one of the

21  reports where he says post-compounding testing verifies the

22  correctness of everything that went before.  If they're putting

23  used tires in there, it will show up after it's liquified.

24       MS. STRATTON:  Yes, he does say that.

11:23:14   25      THE COURT:  You know, if this were an ordinary case,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

 1   having given him one opportunity to clarify his report and

 2   address the issues in the case and his having failed -- not

 3   failed; that's the wrong word -- declined to do it, in an

 4   ordinary case, they don't get to get a new expert or

11:23:41   5   re-rehabilitate this one.

 6              But because of the nature of this problem, I'm

 7   going to let Whitaker and Williams have more latitude; but it's

 8   -- whatever their personal limitations, they do not affect the

 9   availability of scientific data in their defense, not criminal

11:24:05  10   defense, in their defense of this drug being used on them.

11              MS. STRATTON:  Okay.  Dr. Ruble has told me -- and I

12   am not recalling whether or not it's in his second report or not

13   -- that subsequent testing would be helpful; and I do know from

14   talking to Mr. Ottoway that subsequent testing is going to be

11:24:37  15   done.  I think the results of that test, irregardless of the

16   question you want Dr. Ruble to pose, would, in fact, provide him

17   with the data that he believes is missing.

18              THE COURT:  Why wouldn't testing on the morning of the

19   execution moot the argument?  If it's good at 10:00 o'clock in

11:25:05  20   the morning, at 6:00 that evening it's probably still going to

21   be good.

22              MS. STRATTON:  I would say that's probably fair.  I

23   don't think that Dr. Ruble would disagree with that statement.

24              THE COURT:  So -- I mean, that's why all -- and there

11:25:21  25   might be pentobarbital that's brought from a vaulted cistern in

1  Switzerland and some of it is going to go bad.  So, its pedigree

2  is not a guarantee of anything.

3            MS. STRATTON:  Agreed.

4            THE COURT:  It is a guarantee within probably 2,000th

11:25:53  5  of a percent; and so, once we get the immediate answer, that

6  seems to moot the complaint.  I think the State ought to do

7  that.  I refrained from insisting on it last time hoping that it

8  had the wisdom to figure out how to do it.

9            All you have to do is from now on order twice as

11:26:13  10  much.  Isn't that sufficient?

11            MR. OTTOWAY:  I don't know, your Honor.  I don't know.

12            THE COURT:  I mean, if it takes one unit for the

13  injection, you get -- you buy three units.  You test one -- test

14  it when you get it, test it right before the execution; and if

11:26:39  15  it's still good, do the execution.  It seems to me you're just

16  having to increase the purchase volume by 50 percent.

17            That's not a ruling.  I just think -- did the

18  State suspect I was going to do something outrageous where they

19  have an appellate lawyer doing the initial work?  They've had

11:27:06  20  some experience with outrageous things, mainly in response to

21  what it had done.

22            MS. STRATTON:  I think, your Honor, that you're

23  actually honing in on what Dr. Ruble was attempting, even if he

24  didn't say this in his report, is that the nature of compounding

11:27:22  25  versus manufacturing of a drug is such that every batch of drugs

1   is different.

2                   And what you said, testing the day of or testing

3   within a short period, you know, whatever that appropriate short

4   period is based on how it was stored, is -- would be

11:27:43   5   appropriate.  Now, whether that's cost feasible, I don't know.

6   I'm sure that they're going to tell you it's not.

7                   THE COURT:  Is it the case that Whitaker and Williams

8   will stipulate that if the State tests it and the test meets

9   whatever the medical standard is on the day of the execution,

11:28:01   10   the case is moot?

11                   MS. STRATTON:  Possibly.  I don't think that's

12   something I can stipulate to the Court without talking to my

13   clients but --

14                   THE COURT:  Not right now.  But that would be --

11:28:18   15                   MS. STRATTON:  In concept, yes, your Honor.

16                   THE COURT:  Do you speak French?

17                   MS. STRATTON:  "Un peu."

18                   THE COURT:  Do you know how to say "no" in French?

19                   MS. STRATTON:  "Oui."  "No."

11:28:45   20                   THE COURT:  "En principe, oui."

21                   MS. STRATTON:  I can't remember what all --

22                   THE COURT:  In principle --

23                   MS. STRATTON:  Oh.

24                   THE COURT:  -- yes.

11:28:53   25                   MS. STRATTON:  In principle, yes.

1          THE COURT:  No.  Which is the reverse -- if you say,

2    "I'm with you in principle," that means "Don't count on me."

3    So, in principle, that seems to be clear.

4          MS. STRATTON:  Correct.

11:29:45   5          THE COURT:  As I understand it, there's more to the

6    testing protocol than what has been disclosed?

7          MR. OTTOWAY:  I'm sorry, I'm not sure what it is

8    you're referring to.

9          THE COURT:  I don't want you to do the testing or

11:30:25  10   review the testing if it's not a scientific rigorous --

11   scientifically rigorous test.  And so, I guess you've disclosed

12   the results but not the protocol?

13         MR. OTTOWAY:  Well, there was -- there was an

14   affidavit from a DPS chemist who had used these same type of --

11:30:52  15   same type of equipment that the independent laboratory had used,

16   and he was discussing the equipment used and then the nature of

17   the results.

18         THE COURT:  All right.

19              Do Whitaker and Williams have any objection to

11:31:07  20   the testing itself?

21         MS. STRATTON:  I don't know anything about the testing

22   whatsoever except they've told me they're going to do it.  I

23   don't know what kind of testing --

24         THE COURT:  No.  I mean, the process that they've

11:31:18  25   already disclosed that they do do.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MS. STRATTON:  The only thing that I'm aware that they

2     do is that it's sent to -- a portion of a batch is sent to Eagle

3     Labs for testing and the results is that sheet that we've all

4     seen.  And somehow from the pharmacist, they're getting what

11:31:42   5     they're calling a use-by date or an expiration date that -- I

6     mean, they're calling it an expiration date.

7          I don't know anything other than that.  That's

8     all I know.  I mean, I have a million questions I'd like to ask;

9     but I mean, it would, to some extent, require cross-examining

11:32:01  10     the -- someone; and I know that my ability to do that is

11     limited.

12          THE COURT:  What do you know -- see, I'm making them

13     produce stuff and then you say, "Well, we don't know.  We need

14     to ask about it."  You're supposed to have somebody who's told

11:32:16  15     you what's wrong with a test that gives the -- and as I recall,

16     the trooper's report said essentially what he did.  But I have

17     no evidence of anything wrong with the laboratory's testing or

18     what would be the day of testing in the prison.

19          MS. STRATTON:  Okay.  I mean, fair enough.  I have not

11:32:50  20     -- I mean, I have asked Dr. Ruble those questions, but I haven't

21     asked them the way that you're asking them right now.  He does

22     have some opinions about the proper way to do the testing and

23     what would be appropriate.

24          THE COURT:  I suspect he does.  What I need is what is

11:33:13  25     sound pharmacological or chemist, whoever those people are,

1   practices and not standards you might use, say, on therapeutic

2   chemicals.

3            MS. STRATTON:  Understood.

4            THE COURT:  And so, if he has anything to say about

11:33:34   5   testing, it has to be very specific to these kinds of drugs,

6   this kind of application, this kind of waiting.

7            And did I get that right, Mr. Ottoway, that the

8   trooper said -- first, the State says they'll use what the

9   trooper said if there's day-of testing?

11:34:04   10           MR. OTTOWAY:  I'm sorry, your Honor, would you mind

11   repeating that?

12           THE COURT:  If the State of Texas tests the drugs

13   immediately before their use, it will use the process

14   articulated by the state trooper in his affidavit?

11:34:26   15           MR. OTTOWAY:  If we were to test them on the day,

16   I'm --

17           THE COURT:  That's a "yes" or "no" question, counsel.

18           MR. OTTOWAY:  I cannot guarantee it, your Honor.  I

19   don't know that the laboratory that's being used right now could

11:34:41   20   be used in the future.

21           THE COURT:  I didn't say you have to use Room 12B7 in

22   Wing 4 of the Walls Unit.  The process will be the same?

23           MR. OTTOWAY:  Again, your Honor, because we don't know

24   when these individuals will be executed, I cannot say that the

11:35:06   25   same type of testing, if we were to do it on the day of, would

1  be identical to --

2          THE COURT:  Well, find out.  What are they discussing

3  on the day of execution?

4          MR. OTTOWAY:  We had discussed --

11:35:20  5          THE COURT:  No, I don't want what you talked to her

6  about.  She tricked you into saying things.  I want to know

7  what's really going on there at the prison.  You don't know

8  anything about testing drugs.

9          MR. OTTOWAY:  You're right, your Honor, I don't.  The

11:35:34  10  additional tests that we had talked about, you had asked at the

11  prior hearing whether we were going to do additional testing.

12  It wasn't, I believe, specific about whether it was on the day

13  of the execution; and so, we agreed to do it in further

14  discussion with opposing counsel to do another test for a piece

11:35:53  15  of data.  So, I apologize, not --

16          THE COURT:  That will not satisfy Williams and

17  Whitaker, that if you're going to do another date so that

18  Stratton will leave you alone and you're going to keep them for

19  three more years and keep the data -- I mean, the drug for three

11:36:15  20  more years and then use it.

21              I don't know if it makes any difference.  But the

22  simple thing to do -- and this is not a ruling -- is to get

23  three batches.  Test one when it arrives, test the second one

24  the day of the execution, and use the third one, assuming it

11:36:33  25  passes.  And that's a very simple way to solve the problem.

1          MR. OTTOWAY:  I will take that to my client, your

2    Honor.

3          THE COURT:  Like I said, I'm not ordering that; but

4    just another test that is not related to it because, if you wait

11:36:52  5    after the second test, we're back to the same problem.  It's an

6    empty gesture.

7          MR. OTTOWAY:  Again, your Honor, I will take that to

8    my client.

9          THE COURT:  Has your anesthesiologist testified much?

11:37:23  10         MS. STRATTON:  She's testified some.  I mean, she's

11   not a -- I mean, she's a career clinician.  She's not a career

12   expert, but she has testified some.

13         THE COURT:  This is not a criticism.  But it's just

14   weird to sit up there with an evil presence behind you, 14

11:37:43  15   stranger -- well, they won't be here but then a whole bunch of

16   cross and lawyers out there asking you weird questions.  So,

17   acclimating her as a witness -- and even Ruble, if he gets to be

18   one.  Bring them up, let them look at the room, let them walk

19   around, let them get a sense of the place before you throw them

11:38:07  20   in here.  You're used to it.

21         MS. STRATTON:  Understood, your Honor.  I'm going to

22   be a witness in a couple of weeks, your Honor.  I'm not looking

23   forward to it.

24         THE COURT:  Because I want to use her or somebody

11:38:25  25   qualified, but it has to be structured like a medical report.

1 You don't have to write as low as you would for the FDA board in

2 crayon but for an assumed intelligent lady.  We'll just presume

3 that.

4              And if she thinks she needs something that is not

11:39:01  5 reasonably available, if you -- she'll tell you, you can tell

6 him; and if you-all can't agree or it's not reasonably available

7 at all, we can get back together and figure out what to do with

8 it.

9              MS. STRATTON:  Understood.

11:39:23  10              THE COURT:  Anything else for the Petitioners?

11              MS. STRATTON:  Your Honor, the only thing that I want

12 to make the Court -- and I've sort of made opposing counsel

13 aware of -- is I understand your -- if Dr. Ruble gets to

14 testify, where we are on that.  He has a very difficult fall

11:39:42  15 schedule because of his teaching commitments at the University

16 of Utah.

17              He does not have much availability to be away

18 from Utah during the semester with the exception of a week in

19 October and three days in December.  And I just want to make the

11:40:00  20 Court aware of that limitation.  I just became aware of it

21 myself last night.

22              THE COURT:  Ms. Levin, you're not counsel in the Perry

23 habeas corpus case; is that right?

24              MS. LEVIN:  That's correct.

11:40:41  25              THE COURT:  So, why are you filing pleadings?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MS. LEVIN:  That's what the AG wanted to know.  I

2    filed an advisory with the Court because there's this

3    connection --

4          THE COURT:  It's not an advisory, it's a pleading.

11:40:57   5          MS. LEVIN:  It's a pleading labeled an advisory.

6          THE COURT:  I might as well, you know, let the

7    governor of Oklahoma file an advisory in this case because he

8    doesn't think Ottoway is going to do it right.

9          MS. LEVIN:  The connection between the two cases, the

11:41:11  10   fact that --

11         THE COURT:  No.  They're distinct cases.  It's

12   absolutely -- I'm not going to help Judge Gilmore.  She's not

13   going to help me.  Now, in truth, we'll help each other; but

14   we're going to work that out.  They are distinct cases.

11:41:38  15         The information that is in this should have been

16   submitted by a lawyer in that case.  We have that -- well, we

17   got one here when the State filed one telling me they set an

18   execution date.  But it was filed by the Attorney General.

19         MS. STRATTON:  No, your Honor, it was filed by us.

11:42:07  20         THE COURT:  Oh, by you.  But you're a party in this

21   case.  You can do whatever you want to in front of Gilmore --

22   Judge Gilmore; but I find that peculiar.

23         MS. LEVIN:  It was a really unusual situation where he

24   was unrepresented, and this proceeding was a fairly complex one,

11:42:26  25   and I was aware of the situation and was trying to --

1          THE COURT:  Because you'd never talked to him, you

2    couldn't file a notice of appearance on his behalf.

3          MS. LEVIN:  I couldn't file a notice of appearance for

4    any number of reasons.  I couldn't represent him.

11:42:46   5          THE COURT:  Why not?

6          MS. LEVIN:  I don't have the capability or the time in

7    that particular proceeding to represent him right now,

8    particularly, when he had an execution date in 30 days.

9          THE COURT:  So, because you can't do it properly, you

11:43:03  10    can't do it informally.

11          MS. STRATTON:  Your Honor, if I may add, Ms. Levin and

12    I talked about that filing prior to it being filed; and I will

13    tell you my personal concern was -- because the AG's office had

14    informed Judge Gilmore that we were all representing

11:43:30  15    Mr. Williams in this proceeding, frankly, I was concerned that

16    she was going to appoint us to be his counsel; and that would --

17          THE COURT:  I'll call her.

18          MS. STRATTON:  -- that would -- fortunately, she's

19    already appointed somebody else, but --

11:43:45  20          THE COURT:  He needs help.

21          MS. STRATTON:  -- that's not something that --

22    Ms. Levin certainly is well qualified, but that is not something

23    any attorney at Baker Donelson is qualified to do, and I was not

24    -- I was in support of the filing because we wanted to make sure

11:44:01  25    that --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  Why not just file it with --

2          MS. STRATTON:  -- no one was going to accidentally

3  appoint us.

4          THE COURT:  Why not do a nice little simple document

11:44:12   5  and send it to the Attorney General and ask him, "Please bring

6  this to the attention of Judge Gilmore"?

7              They would have done it, wouldn't they?

8          MR. OTTOWAY:  We actually filed the motion for

9  appointment -- oh, I'm sorry.

11:44:30  10          THE COURT:  We've been here a couple of hours.  It

11  seems longer probably to you-all.  But when I ask you a

12  question, I don't want a speech.

13          MR. OTTOWAY:  I apologize, your Honor.

14          THE COURT:  And do Appellate Courts have time limits

11:44:46  15  on you?

16          MR. OTTOWAY:  I have exceeded them many times.

17          THE COURT:  No.  Well, you know, they give me a button

18  that turns off your microphone.  But what I really need is a

19  trap door under where the lawyer stands when they talk too much.

11:45:00  20  But would you -- would the State of Texas have conveyed the

21  information about parallel litigation to Judge Gilmore?

22          MR. OTTOWAY:  Yes, your Honor.

23          THE COURT:  I think you're obliged to do that even if

24  you'd read about it in the newspaper like I read about the

11:45:16  25  collateral proceeding in the paper, the habeas corpus.

                  Gayle Dye, CSR, RDR, CRR - 713.250.5582

1           And I suspect that most lawyers at Baker Donelson

2    could handle any kind of case.  It might take them a little

3    longer than it would a specialist.  It also might allow them to

4    be more innovative in their approach to the case, giving it more

11:45:54   5    life, except maybe patents.  I think it's illegal to try to give

6    life to a patent case.

7                MS. STRATTON:  It probably is.

8                THE COURT:  And so, expertise is overrated.

9                All right.  Ms. Henderson --

11:46:16   10                MS. HENDERSON:  Yes, your Honor.

11                THE COURT:  -- do you have anything?

12                MS. HENDERSON:  No, I guess not.

13                THE COURT:  All right.  I just didn't want her to feel

14    neglected.

11:46:26   15                MS. HENDERSON:  Thank you.

16                THE COURT:  All right.  We'll get an order that says

17    roughly what I've just said.

18                All right.  Thank you, counsel.

19        (Proceedings concluded at 11:46 a.m.)

20

21                C E R T I F I C A T E

22

23        I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter, to
the best of my ability.

24

25    By: /s/ **Gayle L. Dye**_____        **09-16-2015**_____
              Gayle L. Dye, CSR, RDR, CRR            Date



              Gayle Dye, CSR, RDR, CRR - 713.250.5582